505 A.2d 564

**William Stewart SMITH, Jr.**

v.

**STATE of Maryland.**

**No. 739, Sept. Term, 1985.**

Court of Special Appeals of Maryland.

March 7, 1986.

Adkins, J., concurred in part and dissented in part and filed opinion.

Clarence W. Sharp, Assigned Public Defender, Annapolis, (Alan H. Murrell, Public Defender, on brief, Baltimore), for appellant.

Mary Ellen Barbera, Asst. Atty. Gen. (Stephen H. Sachs, Atty. Gen., Kurt L. Schmoke, State's Atty. for Baltimore City and John Getz, Asst. State's Atty. for Baltimore City, on brief), Baltimore, for appellee.

Argued before BISHOP, GARRITY and ADKINS, JJ.

GARRITY, Judge.

The appellant, William S. Smith, Jr. (Smith), was convicted by a jury in the Circuit Court for Baltimore City (Ward, J. presiding) of two counts of robbery with a deadly weapon, two counts of kidnapping, two counts of the use of a handgun in the commission of a crime of violence, and unauthorized use of an automobile. He was sentenced to the jurisdiction of the Division of Correction for a total period of 15 years. We are asked to review the following questions:

1. Was the evidence presented sufficient to support appellant's convictions?

2. Did the trial judge's overall conduct of the trial, including his intervention in questioning the witnesses, deny appellant a fair trial and due process of law?

3. Did the trial court err in failing to give the missing witness instruction to the jury and in adding an instruction on aiding and abetting which unfairly highlighted this aspect of the case?

4. Did the trial court improperly respond to communications from the jury?

## I. *Sufficiency of the Evidence*

To determine whether the evidence presented at trial is sufficient to support the convictions of the appellant, the appropriate test is whether "after viewing the evidence in a light most favorable to the prosecution, *any* rational trier of fact could have found the essential elements of the crime beyond a reasonable doubt." (original emphasis). *Jackson v. Virginia,* 443 U.S. 307, 319, 99 S.Ct. 2781, 2789, 61 L.Ed.2d 560 (1979). *See Johnson v. State,* 303 Md. 487, 510, 495 A.2d 1 (1985); *State v. Rusk,* 289 Md. 230, 245, 424 A.2d 720 (1981); *Waddell v. State,* 65 Md.App. 606, 501 A.2d 865 (1985).

On August 12, 1984, Michael Carter was having a late-night party at his home in the Wakefield Apartments in western Baltimore City. Among his guests were William

Magwood and Pierre Plater. Plater had arrived at approximately 12:30 a.m. with some friends. As the party progressed in a normal fashion, the appellant and three of his companions, all of whom were uninvited, walked into the apartment and created a disturbance. Most of the twenty-five guests then began to leave.

While Magwood was in the process of turning his car around to leave the parking lot, he observed the appellant and his cohorts harassing a young lady. As Magwood alighted from his vehicle and was walking to her assistance, one member of the group stopped him at the point of a gun as the appellant hit him. Magwood managed to stumble back into his car but was pulled out by the appellant. While one member of the group held a gun on the spectators to prevent interference, two others beat and kicked Magwood. At about this time, Pierre Plater, a friend of Magwood, was leaving the party and entering the parking lot. Upon seeing Magwood "hobbling" to his car, Plater offered his assistance and helped Magwood into his car. Apparently, at this point, two of the group, identified at trial as Michael Green and Gilbert Pack, managed to get into the back seat of Magwood's car. Plater testified that, since he was not present during the fight, he had assumed the two were acquaintances of Magwood.

Upon seeing that one of the men was wielding a long-barrelled handgun, however, Plater followed their orders to take a certain route. The two men directed Plater to drive to a nearby "dark area called Dickeyville" and stop the car. He did so. The men then demanded that Plater and Magwood hand over money and any watches and jewelry they possessed. Plater and Magwood complied by giving approximately $20 to the assailants. The car remained parked for about a minute until the appellant walked up and entered the vehicle. The appellant had taken a shortcut to the area by walking along a footpath. Upon entering the vehicle, the appellant asked the assailants, according to Magwood, "How much money do we have?" One replied, "We have $20." The appellant then ordered Magwood to

sit in the back seat. Although the appellant initially sat in the passenger seat before Plater was ordered to drive on, the appellant eventually decided to drive the vehicle himself. Since the car was low on fuel, Smith requested money for gasoline. Green and Pack gave Smith a portion of the money they had acquired from the victims and so informed the appellant. The appellant then drove to a gas station before continuing on for nearly four hours.

Throughout this entire travail Magwood was in the back seat between the two men, who were beating him. At one point, two others got into the back seat and aided Park and Green in this endeavor. The appellant eventually drove the car to downtown Baltimore and then out the Jones Falls Expressway to Pikesville. As the sun began to rise, the men returned to Baltimore and stopped at a 7-Eleven store. At this point, Plater and Magwood managed to escape and call the police.

The appellant contends that, since he was not present at the time of the robbery or the commencement of the kidnapping, he cannot be convicted of either of these offenses. He argues that his actions took place after the crimes had been committed; therefore, his conduct could constitute no more than participation as an accessory after the fact. The State, on the other hand, argues that the fact Smith was not present at the moment of the commission of the robbery does not absolve him of guilt as a principal in the second degree.

■ A principal in the second degree is one who is actually or constructively present when a felony is committed, and who aids or abets in its commission. *Pope v. State*, 284 Md. 309, 396 A.2d 1054 (1979).

■ As to the robbery offense, we believe it clear that any rational trier of fact could have concluded beyond a reasonable doubt that the appellant had been a principal in the robbery of Magwood and Plater. He had been with Green and Pack prior to the robbery and had acted in direct concert with their disruptive, obnoxious, and assaultive

conduct. After the appellant assaulted Magwood, Green and Pack abducted both Magwood and his companion Plater. They then instructed Plater to drive to a particular nearby location where they ordered Plater to stop the car. Shortly after the victims had been robbed at gunpoint, the appellant appeared on the scene via a footpath and asked how much money the assailants had.

As to the offense of kidnapping, the appellant avers that the evidence was insufficient to show that he had "assaulted" either Magwood or Plater, which he contends is a "necessary ingredient" of kidnapping. However, "[t]he gist of the offense of kidnapping in Maryland is unlawful confinement coupled with transportation of the victim.... The initial assaultive taking of the person and the carrying out of the State required at common law are not part of the Section 337 offense." *Tate v. State,* 32 Md.App. 613, 615–17, 363 A.2d 622, *cert. denied,* 278 Md. 736 (1976); *see Watkins v. State,* 59 Md.App. 705, 723–25, 478 A.2d 326 (1984). Indeed, the appellant was charged and convicted under Article 27, Section 337 of the Maryland Code. Therefore, assault is not a necessary element to support the appellant's conviction. We hold that the direct evidence of Smith's conduct in the on-going crime was sufficient to support his conviction on the kidnapping charge.

## II. *Conduct of the Trial Judge*

The appellant next contends that the trial judge "abandoned his role as an impartial arbiter early on, repeatedly took over the questioning of the prosecution witnesses, often at the critical points of their testimony, sometimes summarized their testimony with leading questions and took on an inquisitorial role."

We have but few guidelines to aid our determination of the point at which a trial judge no longer is an impartial arbiter attempting to aid the jury in its quest for the truth. As we stated in *Bell v. State,* 48 Md.App. 669, 678, 429 A.2d 300 (1981), "[w]e are blessed in Maryland by the fact that

no judge's conduct has ever compelled reversal because he has by the form, manner or extent of his questioning, indicated to the jury his opinion as to the defendant's guilt."

The appellant points to eight specific instances which he characterizes as abuses of the trial judge's role. In preface of our review, it must be understood that although the two victims in this case were very alert and bright young men, they had not known the assailants beforehand and had difficulty in describing which particular assailant was responsible for specific acts throughout the four-hour ordeal.[1] As an example of such testimony, the following colloquy took place between the trial judge and Mr. Plater after the witness had testified that:

I thought we were going up towards the hill, up towards the top of the hill, which was where I had to go anyway. And they said they wanted to go and I didn't know if he knew them at this time. After he got in, I saw the gun and I saw that he was obviously incompetent to answer or something.

THE COURT: Who is he?

THE WITNESS: Mr. Magwood.

THE COURT: Mr. Getz, all this he, they, he, they. I don't know who he is talking about. You've got to start—

After the trial judge most appropriately cautioned the witness and the prosecutor to be more specific as to their references, the trial judge took over questioning Witness Plater in the following manner:[2]

BY MR. GETZ (Assistant State's Attorney):

Q You remember driving to Dickeyville to what—

THE COURT: Let me see if I can start. You got in the car originally to help out Mr. Magwood drive home?

---

1. Mr. Plater, however, testified that he had been on athletic teams with Smith's brother and had recognized the appellant.

2. The questions propounded by the trial judge were apparently based on Plater's immediately preceding testimony.

THE WITNESS: Correct.

THE COURT: The other two got in and you drove off?

THE WITNESS: Correct.

THE COURT: You went to Dickeyville, that's where they directed you to go?

THE WITNESS: Correct.

THE COURT: At Dickeyville, what was the next step? What happened at Dickeyville? You stopped and Mr. Smith got in the car?

THE WITNESS: Correct.

THE COURT: At that point?

THE WITNESS: Correct.

THE COURT: They told you to drive off again?

THE WITNESS: No. I had—when we stopped, Mr. Smith got out of the car and went into the driver's seat and I moved over.

THE COURT: So, you're in the center of the front seat?

THE WITNESS: No. I'm in the passenger seat.

THE COURT: There are two people in the front seat?

THE WITNESS: Right.

THE COURT: Mr. Smith is driving?

THE WITNESS: Correct.

THE COURT: You're in the right front seat?

THE WITNESS: Correct.

THE COURT: Who's behind you in the back?

THE WITNESS: Michael Green, Mr. Magwood and Gilbert Pack.

THE COURT: The other two men started off with you and your friend Magwood, they're now in the back seat and Magwood is in between them?

THE WITNESS: Correct.

THE COURT: At Dickeyville, you're now in the passenger seat. What happened next?

THE WITNESS: At Dickeyville?

THE COURT: That's what you said.

THE WITNESS: I wasn't in the passenger seat at Dickeyville.

THE COURT: When Mr. Smith got in the car at Dickeyville? He was in the passenger seat?

THE WITNESS: Correct.

THE COURT: That was Willie?

THE WITNESS: Yes.

THE COURT: You're still driving?

THE WITNESS: Yes.

THE COURT: After Smith got in the car, they told you to drive off again?

THE WITNESS: Correct.

THE COURT: You drove up to where when something—

THE WITNESS: A few blocks past my house.

THE COURT: Hillsdale. What happened then?

THE WITNESS: I moved over into the passenger seat.

THE COURT: Why? Why did you do that?

THE WITNESS: Because Mr. Smith said so.

THE COURT: What did he tell you?

THE WITNESS: He said he wanted to drive.

THE COURT: Did you do that willingly or unwillingly?

MS. GUTIERREZ (Assistant Public Defender): Objection.

THE COURT: Overruled. Why did you move over? Did you want to move over?

THE WITNESS: I wanted to get out of there. I don't know. It's hard to say. I mean—it wasn't threatening when he said move over. He just said move over.

THE COURT: What was your state of mind at that time?

MS. GUTIERREZ: Objection.

THE COURT: You moved over into the passenger seat; is that right?

THE WITNESS: Correct.

THE COURT: Mr. Smith, the Defendant, is driving the car?

THE WITNESS: Correct.

THE COURT: What happened next?

THE WITNESS: We go to the gas station on Park Heights.

THE COURT: Go directly to the gas station?

THE WITNESS: They were driving around and we then—we went—that's what I remember. We were driving around a little bit and then we went to the gas station.

THE COURT: Is this the same gas station you mentioned on Park Heights Avenue?

THE WITNESS: Correct.

THE COURT: You only went to one gas station?

THE WITNESS: Correct.

THE COURT: Park Heights Avenue gas station, what happened?

THE WITNESS: Mr. Smith got out of the car, paid for the gas and got back in the car and we proceeded downtown.

THE COURT: All right. What point was the money taken from you?

THE WITNESS: Down in Dickeyville.

THE COURT: Who was present when the money was taken?

THE WITNESS: Michael Green and Gilbert Pack.

THE COURT: Mr. Smith was not present?

THE WITNESS: No, he wasn't.

THE COURT: Now, Mr. Smith at the gas station, what was the conversation that took place concerning money, if any?

MS. GUTIERREZ: Objection.

THE COURT: Overruled.

THE WITNESS: Pardon?

THE COURT: The money at the gas station, was there some conversation in the car between several people?

THE WITNESS: Yes. They were wondering how much all three of the guys, that's Gilbert Pack, Michael Green, and Willie Smith, were wondering how much money they should put in. They finally got it together.

THE COURT: For what?

THE WITNESS: For gas.

THE COURT: Whose money was this that was gathered together?

THE WITNESS: Our money. Mr. Magwood and myself.

THE COURT: You said you had $12 of it. Then you went in the gas station and you headed downtown?

THE WITNESS: Correct.

THE COURT: Then, you said something about some other guys?

THE WITNESS: As we were going to downtown, we had got on Reisterstown Road. And we were going in the direction of downtown and they needed a ride around the corner. Two guys outside of the car needed a ride.

THE COURT: How did they flag the car?

THE WITNESS: All of them got by Mr. Smith, Mr. Green and Mr. Pack knew the guys and they got in the back seat. So it was five people.

THE WITNESS: So, they proceed to punch him.

THE COURT: Who is they?

THE WITNESS: The two guys and the other two guys in the back seat proceeded to punch him because they were going—as we were driving around to where the two guys needed a ride to.

THE COURT: So, all four proceeded to punch Magwood?

THE WITNESS: Right, And they learned of the story, I don't know who told.

MS. GUTIERREZ: Objection.

THE WITNESS: They learned—

THE COURT: Sustained. Wait a minute for a question.

What about Mr. Smith, was he in the car during this time?

THE WITNESS: Yes.

THE COURT: What was he doing?

THE WITNESS: Driving.

THE COURT: Did he punch Mr. Magwood?

THE WITNESS: No.

THE COURT: Go ahead, Mr. Getz.

MR. GETZ: Thank you. Your Honor.

Although at one point the trial judge advised the prosecutor that, "[y]ou have the right to try your own case," unfortunately, the trial judge occasionally lapsed into an inquisitorial pattern, although not nearly as extensive as that portion of the transcript related above. On one such occasion, defense counsel protested that the court was "trying the case for the State" when it asked the following questions of Mr. Magwood:

THE COURT: You stated that after the money was turned over to the two in the back that one on each side of you, right after that or soon after that Mr. Smith came to the car and got in the car?

THE WITNESS: Right.

THE COURT: And then he said according to your testimony, how much money do we have? He was speaking to the other two men?

THE WITNESS: Right.

THE COURT: Do you know if Mr. Smith was aware of the source of that money?

MS. GUTIERREZ: Objection.

THE COURT: Overruled.

THE WITNESS: I'm not sure.

THE COURT: You do not know for sure?

THE WITNESS: Right.

THE COURT: During the night as the night went on, as the hours went by, did there ever come a time when Mr. Smith was informed of the source of that money?

THE WITNESS: Yes.

THE COURT: When was that?

MS. GUTIERREZ: Objection.

THE COURT: What's the basis of your objection?

MS. GUTIERREZ: Your Honor is trying the case for the State.

THE COURT: I'm trying—administration of justice, I'm trying to find out whether or not Mr. Smith knew where the source of the money was. Overruled.

THE WITNESS: Because the other two got $20.

THE COURT: Tell me that again.

THE WITNESS: Said they got $20 from us.

THE COURT: Who did they say that to?

THE WITNESS: Mr. Smith.

THE COURT: When did that occur?

THE WITNESS: After we left Dickeyville going to the gas station.

THE COURT: Do you have any questions as a result of my questions?

In addition to the appellant's complaint that the trial judge's conduct of repeated interference influenced the jury, Smith avers that it was also prejudicial for the trial judge to have laid the foundation for certain photographs that the State sought to admit in evidence. That portion of the trial is reflected in the transcript as follows:

BY MR. GETZ:

Q Can you identify what's depicted in those photographs, sir?

THE COURT: Do you have an objection?

MS. GUTIERREZ: Yes.

THE COURT: Basis?

MS. GUTIERREZ: Not laid a foundation.

THE COURT: Yes. Sustained. You're asking about four photographs?

MR. GETZ: I'm attempting to lay—can we approach the bench, Your Honor?

THE COURT: No, denied. Are you able to tell us whether these photographs that you're examining now give a fair and accurate representation as to the condition as they existed at the time that you got out of the car and ran away from this car on the night in question that you have been testifying to with respect to your injuries?

THE WITNESS: Yes.

MS. GUTIERREZ: Objection. May we approach the bench?

THE COURT: No. Permission denied. Next question.

MR. GETZ: I was just about to do that, Your Honor. In any event, I would move to admit the photographs.

MS. GUTIERREZ: Objection.

THE COURT: All right. Overruled.

MR. GETZ: Thank you.

Speaking on our behalf in *Bell v. State*, 48 Md.App. at 678, 429 A.2d 300, the late Judge Lowe observed:

The trial judge's role is that of an impartial arbitrator and that appearance is not generally compatible with an inquisitorial role. It is the better practice for a trial judge to inject himself as little as possible in a jury case, *United States v. Green*, 429 F.2d 754, 760 (D.C.Cir.1970), because of the inordinate influence that may emanate from his position if jurors interpret his questions as indicative of his opinion. *See, also, Patterson [v. State ]*, 275 Md. 563, 578–80 [342 A.2d 660] (1975). The appearance that a judge may have abandoned his role as an impartial arbitrator, is especially hazardous when cross-questioning a defendant.

Yet, if counsel have faltered in their advocacies, it is not improper for a trial judge to be "meticulously careful to make sure that the full facts [are] brought out," *Jefferies v. State*, 5 Md.App. 630, 632 [248 A.2d 807]

(1959), or to seek to discover the truth when counsel have not elicited some material fact, or indeed when a witness has not testified with entire frankness. Annot., 84 A.L.R. 1172, 1193 (1933). Such questioning may even bear upon the credibility of a defendant in a proper circumstance. *Madison v. State,* 200 Md. 1, 12 [87 A.2d 593] (1952); *King v. State,* 14 Md.App. 385, 393–94 [287 A.2d 52] cert. denied, 265 Md. 740 (1972). This should be achieved expeditiously, however, if at all, for a protracted examination has a tendency to convey to a jury a judge's opinion as to facts or the credibility of witnesses.

Concluding that the trial judge in *Bell* did not manifest an opinion adverse to the appellant or adverse to his defenses, Judge Lowe cautioned, "[w]e admonish any trial judge, however, to avoid brinkmanship and to sin, if at all, on the side of silence."

Although we also recognize that the trial judge sporadically exhibited a somewhat impatient and intolerant attitude toward counsel, such conduct seemed equally directed and without prejudicial effect upon the appellant. The Court of Appeals held in *Bryant v. State,* 207 Md. 565, 584, 115 A.2d 502 (1954): "Unless there is some showing that the judge's statements influenced the jury against the defendant the mere fact that the trial was conducted in an impatient and brusque way does not justify a reversal of the judgment." Also see *Apple v. State,* 190 Md. 661, 59 A.2d 509 (1947).

■ While acknowledging the discretionary right of a trial judge to question witnesses, it is painfully obvious in the case *sub judice* that the trial judge ofttimes overly injected himself as an inquisitor throughout the direct examination of both victims. We hasten to add, however, that the trial judge brought out testimonial clarity in reference to acts of specific assailants.

We have scrupulously combed the transcript of testimony without finding that the trial judge's questions or attitude reflected prejudicial unfairness, partiality or an opinion of guilt as to the accused. In light of the overwhelming

evidence which had established the elements of the offenses and the criminal agency of Smith prior to the improper conduct of the trial judge, we believe beyond a reasonable doubt that the court's undue injection into the trial did not have the effect of influencing the verdict of the jury, and was therefore harmless.

## III. *Jury Instructions*

### A. *Missing Witness Instruction*

The appellant asseverates that the trial court erred in not giving a missing witness instruction to the jury. The missing witnesses referred to by the appellant are eight people who were in the parking lot near William Magwood's car on the night in question. Also, the police officer who had issued the appellant the traffic ticket in Baltimore County did not appear at the trial. When the appellant's trial counsel requested the missing witness instruction, the trial judge refused and stated that these witnesses were available to both parties and that their testimony would have been merely cumulative.

While the appellant contends that the testimony of these witnesses would not have been cumulative, there appears to be little dispute as to the fact that these witnesses were equally available to both parties.

The "missing witness instruction" is that the failure of a party to call a material witness raises a presumption or inference that the testimony would have been unfavorable to the party failing to call such witness. *Christensen v. State,* 274 Md. 133, 134, 333 A.2d 45 (1975). When a witness is available to both parties, however, the fact that neither party called the witness does not give rise to the missing witness instruction. *Bailey v. State,* 63 Md.App. 594, 610–12, 493 A.2d 396 (1985); *Yuen v. State,* 43 Md. App. 109, 112, 403 A.2d 819 (1979); *Hutchinson v. State,* 41 Md.App. 569, 574, 398 A.2d 451 (1979). In the matter *sub judice,* the appellant, through the subpoena process, could have easily summonsed any of these witnesses. Further-

more, as the trial judge indicated, any testimony by these witnesses may have been cumulative. There is nothing on the record to indicate otherwise nor did the appellant effectively proffer or argue to the contrary. When the evidence is merely cumulative, the missing witness instruction need not be given. *Winegan v. State,* 10 Md.App. 196, 268 A.2d 585 (1970); *Nelson v. State,* 5 Md.App. 109, 245 A.2d 606 (1968).

### B. *Aiding and Abetting Instruction*

■ At the conclusion of the trial judge's charge to the jury, the State requested an additional instruction on the definition of aiding and abetting as to the handgun offense. Instead, the trial judge instructed the jury generally on the meaning of aiding and abetting. The appellant argues that the instruction highlighted this aspect of the case. The particular instruction, however, was simply a more complete definition of the term "aiding and abetting." The trial judge need not follow the precise scope of the requested instruction. He may modify it so as to be a definitive statement of the pertinent law. *See King v. State,* 36 Md.App. 124, 135–36, 373 A.2d 292 (1977).

### IV. *Communications Between the Trial Court and the Jury*

Again, the appellant seriously contests the trial judge's conduct. He contends that the court's method of reinstructing the jury was a "flagrant disregard for the provisions of Maryland Rule 4–326(c), a denial of appellant's right to be present at a stage of his trial, and a general disregard of the accepted practice of at least conferring with counsel before responding to any communication from the jury during its deliberations."

Approximately 40 minutes after the jury retired to deliberate, it returned to the courtroom.[3] The transcript reflects the following:

THE COURT: Now, Mr. Edmonds, I have received a question that you desire me to read the definition of the crimes.

THE FOREMAN: No, the definition of assault.

THE COURT: Just the assault, is that right?

A JUROR: Assault and battery and then you can complete—

THE FOREMAN: The definition of what assault is.

THE COURT: Assault and battery, the way it's written—

MS. GUTIERREZ (defense counsel): Your Honor, may we approach the bench?

THE COURT: Well, I'm going to tell them that. What I did was I read a definition of assault to you and I added to that that assault includes a slight touching or hitting or battery. That's all I said with respect to battery.

Now, I'm going to read assault to you over again but that's what I said. That's not what's confusing you—

A JUROR: No, the charge is assault and battery, is that right?

MS. GUTIERREZ: Your Honor, I must object and ask to approach the bench.

THE COURT: Denied. Ms. Holmes, what did you say?

A JUROR: The charge on the sheet is assault and battery, is that correct?

THE COURT: Yes.

THE JUROR: Well, then, we want a definition of what assault and battery is for those charges.

After reinstructing the jury on the definition of assault and battery the transcript reflects the following:

---

**3.** It is clear from the record that both the appellant's trial counsel and the assistant State's Attorney were present during the communications between the court and the jury. Although the record is silent as to the presence of the accused, we were advised at oral argument that Smith was in the courtroom.

THE COURT: Now, does that include the only definitions you want?

THE JURY: That's it.

THE FOREMAN: That's it, right there.

THE COURT: Is that right, Mr. Brooks, because you started to say something before?

MS. GUTIERREZ: Your Honor, I object to the questioning of the jury on the record.

THE COURT: Now, of course, I can't hear what you're saying.

A JUROR: Robbery with a dangerous weapon, would that include aiding and abetting?

THE COURT: Robbery with a deadly weapon, what about it?

A JUROR: You included aiding and abetting when you defined the definition of it?

THE COURT: I defined robbery and a deadly weapon and I also defined aiding and abetting.

A JUROR: Right.

Thereupon, the jury retired to consider its verdict. Then the transcript reflects the following:

MS. GUTIERREZ: Yes, Your Honor. I would object to the procedure the Court used to question the jury, to allow the jury to discuss it out loud, and question not just the Foreman, but as to the other jurors who were discussing it *and were having a conversation with Your Honor at the bench* that—(Emphasis added).

THE COURT: The conversation is all noted on the record, isn't that correct?

THE COURT REPORTER: Yes.

THE COURT: How many times do you have to object, Ms. Gutierrez?

MS. GUTIERREZ: As often as is required by my job, Your Honor.

Maryland Rule 4–326(c) governs the procedure as to communications between the court and a jury. The Rule provides:

The court shall notify the defendant and the State's Attorney of the receipt of any communication from the jury pertaining to the action before responding to the communication. All such communications between the court and the jury shall be on the record in open court or shall be in writing and filed in the action.

The record clearly demonstrates that the trial judge flagrantly failed to follow the Maryland Rule.

 While the Rule expressly requires notice to the parties of any communication from the jury, its very spirit is to provide an opportunity for input in designing an appropriate response to each question in order to assure fairness and avoid error. Furthermore, the cavalier procedure of carrying on a general conversation with the jury, and in particular with individual jurors at the bench, constitutes clear error. Our sole remaining task is to determine whether the error was prejudicial.

"[W]hen an appellant, in a criminal case, establishes error, unless a reviewing court, upon its own independent review of the record, is able to declare a belief, beyond a reasonable doubt, that the error in no way influenced the verdict, such error cannot be deemed 'harmless' and a reversal is mandated." *Dorsey v. State*, 276 Md. 638, 659, 350 A.2d 665 (1976); *Lodowski v. State*, 302 Md. 691, 728, 490 A.2d 1228 (1985); *Hopper v. State*, 64 Md.App. 97, 106, 494 A.2d 708 (1985).

 Under Maryland law, reinstructions to the jury in response to its questions are totally within the discretion of the trial judge. *Oliver v. State*, 53 Md.App. 490, 505, 454 A.2d 856 (1982); *Funkhouser v. State*, 51 Md.App. 16, 31, 440 A.2d 1114, cert. denied. 293 Md. 331 (1982). Nevertheless, if the reinstruction is ambiguous, misleading or confusing, and thereby prejudicial to the defendant, such error may be properly rectified on appeal. *Battle v. State*, 287 Md. 675, 414 A.2d 1266 (1980).

■ As to the substance of the reinstruction on assault and battery, the appellant neither alleges error nor do we find any. Furthermore, although the colloquy thereafter between the court and jury invited hazards leading to prejudicial error, we found none to be present. The conversations between the trial judge and individual jurors consisted of mere acknowledgements by the judge that he had previously covered certain instructions.

Upon our independent review of the record, we believe beyond a reasonable doubt that the failure of the trial judge to follow Maryland Rule 4–326(c) when communicating with the jury, in no way influenced the verdict. We hold, therefore, that the error was harmless.

JUDGMENTS AFFIRMED.

COSTS TO BE PAID BY APPELLANT.

ADKINS, J., concurs and dissents.

ADKINS, Judge, concurring in part and dissenting in part.

I join in parts I, III, and IV of the opinion in this case. But because I disagree with the conclusion reached by the majority in Part II, I respectfully dissent from that portion of the opinion.

Part II deals with the conduct of the trial judge-conduct, argues appellant, that shows the judge "abandoned his role as impartial arbiter early on, repeatedly took over the questioning of the prosecution witnesses, often at critical points of their testimony, sometimes summarized their testimony with leading questions and took on an inquisitorial role." The majority candidly acknowledges that the trial judge erred in this regard: "it is painfully obvious in the case *sub judice* that the trial judge ofttimes overly injected himself as an inquisitor throughout the direct examination of both victims." Majority opinion at 14a. With this conclusion I wholeheartedly agree. I cannot agree that the judge's improper conduct was harmless error beyond a reasonable doubt.

"The law requires the trial of a defendant not only to be fair but to give every appearance of being fair." *Scott v. State,* 289 Md. 647, 655, 426 A.2d 923 (1981). One of the most fundamental characteristics of a fair trial is that an impartial judge preside over it. *Marshall v. State,* 291 Md. 205, 214, 434 A.2d 555 (1981). As the late Judge Lowe put it, "[t]he trial judge's role is that of an impartial arbitrator and that appearance is not generally compatible with an inquisitorial role." *Bell v. State,* 48 Md.App. 669, 678, 429 A.2d 300, *cert. denied,* 291 Md. 771 (1981). The judge must be "scrupulously careful to preserve an attitude of impartiality." *Patterson v. State,* 275 Md. 563, 578–80, 342 A.2d 660 (1975). When the trial judge undertakes the trial functions of the prosecutor, that essential impartiality is lost; "our adversarial system [is] abandoned in favor of an inquisitorial one." *Smith v. State,* 64 Md.App. 625, 634, 498 A.2d 284 (1985). That, I believe, is what happened here.

Indeed, we all agree that the trial judge improperly assumed the inquisitorial or prosecutorial role. The majority, viewing the judge's intervention as in part designed to clarify testimony, believes that his conduct, on balance, falls on the safe side of that "brinksmanship" condemned by Judge Lowe in *Bell.* 48 Md.App. at 678, 429 A.2d 300. I see it otherwise.

The majority sets forth the transcript's account of the judge's first major intervention during the trial. That intervention occurred during the State's direct examination of Pierre Plater, one of the principal witnesses for the prosecution.[1] Majority opinion at 610–616. The first few questions and answers in this exchange may well have amounted to no more than appropriate clarification. But the judge did not stop there. Summarily overruling defense objections to his frequent leading questions, he went on to emphasize the witness's prior testimony by leading Plater

---

1. Plater and Willie Magwood were the victims of the crimes with which appellant was charged. A review of the record shows that convictions would not have been possible without their testimony.

through an extensive recapitulation of events most of which the witness had previously recounted.

Later, the judge engaged in extensive questioning of Willie Magwood, another critical witness for the State.[2] Majority opinion at 616–617. This episode occurred after both prosecution and defense counsel had indicated they were through with the witness. The judge, however, apparently unable to restrain his prosecutorial enthusiasm, and without any discernible need for clarification, examined the witness himself, again recapitulating and re-emphasizing the testimony.

On other occasions the judge sprang into action before the prosecutor had an opportunity to do so. For example, at one point the assistant State's attorney was preparing to offer a photograph in evidence, and was about to lay a foundation. The judge shunted the prosecutor aside and laid the foundation himself. Majority opinion at 617.

In still other instances the judge took it upon himself to re-establish matters already sufficiently established. Examples of this are again seen in the examinations of Plater and Magwood. Appellant was charged with, *inter alia,* two counts of commission of a crime of violence by use of a handgun. Plater testified that a gun used by one of appellant's cohorts was a handgun—a revolver with a barrel 7 to 8 inches long. Not satisfied with this, the judge enquired:

,.. Can you tell us from your knowledge whether it was a handgun or a rifle?

THE WITNESS: It was a handgun.

THE COURT: Can you tell us whether it was—was there anything else besides a handgun? Was it a shotgun?

THE WITNESS: It was a handgun.

THE COURT: Are you sure of that?

THE WITNESS: I'm positive.

---

**2.** *See* note 1, *supra.*

A little later Magwood explained that the weapon was a black gun with a 4-inch barrel. The judge immediately intervened:

> THE COURT: Can you tell us whether it was a rifle, shotgun, or ... handgun, from your knowledge of guns?[3]
>
> THE WITNESS: A handgun.

There were other incidents of judicial intervention, mostly of lesser degree. It would serve no useful purpose to set them out at length. Nor is it appropriate to consider each one in isolation, and to discuss whether each particular incident, standing alone, would constitute reversible error. The record of this jury trial must be reviewed as a whole. When that is done a pattern is revealed. That pattern is frequent intervention by the judge, during examination of the two most important witnesses for the State, in order to assist the prosecution in establishing its case. On each occasion the judge brought out evidence favorable to the prosecution, either by eliciting through recapitulation the emphasis of previous testimony or by going into matters before the prosecutor had had an opportunity to do so. The judge did not offer the defense the same sort of assistance he tendered the State. During cross-examination by defense counsel, he did not intervene with supportive questions, although he did indulge in an occasional sarcastic comment, *e.g.*: "I'm sure this is interesting. But...." "What is this, a memory test?"

The pattern disclosed by the whole record, it seems to me, was bound to convey to the jury the impression that the judge sided with the prosecution and against the defense. The appearance of impartiality, if not impartiality in fact, was destroyed. At the very least, I cannot say beyond a reasonable doubt that the impression of pro-prosecutorial bias was not conveyed to the jury. And if, as the majority

---

**3.** It had not been shown that Magwood had any "knowledge of guns."

suggests, the case against appellant was a strong one, it was made so at least in part by the trial judge's conduct.

The essence of this case is captured in the dialogue set forth at page 19 of the majority opinion. The judge and the jury were discussing instructions. Ms. Gutierrez, the defense lawyer, objected to a procedure we all agree was in violation of Md. Rule 4–326(c). Majority opinion at 624. The judge, who had summarily overruled numerous defense objections and requests for bench conferences, asked: "How many times do you have to object, Ms. Gutierrez?" The response was: "As often as is required by my job, Your Honor." Defense counsel was doing her job, defending her client against the combined efforts of the assistant State's attorney and the judge. The judge was not doing his job; he was prosecuting.

I would reverse.