567 A.2d 967

**Malcolm Duane McCALLUM, Jr.**

v.

**STATE of Maryland.**

**No. 34, Sept. Term, 1989.**

Court of Special Appeals of Maryland.

Jan. 4, 1990.

Certiorari Granted March 13, 1990.

404

Bradford C. Peabody, Asst. Public Defender (Alan H. Murrell, Public Defender, on the brief), Baltimore, for appellant.

Cathleen C. Brockmeyer, Asst. Atty. Gen. (J. Joseph Curran, Jr., Atty. Gen., Baltimore, and Frank R. Weathersbee, State's Atty. for Anne Arundel County, Annapolis, on the brief), for appellee.

Submitted before BISHOP, GARRITY and ALPERT, JJ.

BISHOP, Judge.

Malcolm Duane McCallum, Jr., the appellant, was tried before a jury in the Circuit Court for Anne Arundel County for a series of violations of the Transportation Article. The jury convicted appellant of: driving a motor vehicle on a suspended license (Md. Transportation Code Ann. § 16–303 (1987)) (referred to hereinafter by section number); driving an unregistered vehicle (§ 13–401); unauthorized use of a registration card (§ 13–703); unauthorized use of a license plate (§ 13–703); failure to display registration card to a police officer upon request (§ 13–409); and failure to dis-

play license to a police officer upon request (§ 16–112). For the conviction of driving on a suspended license, appellant was sentenced to one year in jail with all but ninety days suspended. He was fined a total of $470.00 for the other five convictions.

Appellant argues that:

I.   The charges should have been dismissed because he was not tried within the 180–day period required by Md. Rule 4–271;

II.  The trial judge erred when he refused to instruct the jury that in order to convict they had to be convinced he committed the crimes "knowingly;" and

III. The trial judge erred in allowing the jury to have appellant's entire driving record available for use during their deliberations.

## FACTS

On the morning of October 12, 1987, Officer Mike Rudiger of the Anne Arundel County Police Department investigated a motor vehicle accident in which appellant was involved. When the officer asked for his driver's license, appellant was unable to produce it. Further investigation revealed that the license was suspended. When the officer asked appellant for the registration card to the 1982 Ford pick-up truck he was driving, appellant presented a registration card for a 1985 Ford pick-up truck. Officer Rudiger then determined that the tags on the 1982 Ford pick-up truck involved in the accident were the tags which belonged to the 1985 Ford pick-up truck on the registration card.

Appellant testified at trial that he had not intentionally committed any of the violations. As to the suspended license, he explained that his license had been suspended because he had not paid a fine. He said that he had since paid the outstanding fine and was, at the time of the accident, on his way to the Motor Vehicle Administration to

retrieve his license I.D. card.[1] He explained that he carried the wrong registration card and license tags because of a mistake. Also, he testified that he owned the 1982 Ford pick-up truck that he was driving and that his step-father owned the 1985 Ford pick-up truck, the vehicle to which the tags on the 1982 truck had been affixed. He said that he had put the 1985 truck's tags on his truck by mistake.

## DISCUSSION

### I.   Rule 4–271(a)

Appellant argues that he was not tried within the 180–day limit required by Md.Rule 4–271(a). That rule in pertinent part provides the following:

> (a) **Trial Date in Circuit Court.**—The date for trial in the circuit court shall be set within 30 days after the earlier of the appearance of counsel or the first appearance of the defendant before the circuit court pursuant to Rule 4–213, and shall be not later than 180 days after the earlier of those events.

The issue in the case *sub judice* concerns the time at which calculation of the 180 day period is commenced. Appellant concedes that his counsel entered his appearance on May 6, 1988, and that, if the Rule 4–271 time clock starts on that date, the State complied with the rule. Appellant contends, however, that March 28, 1988 is the starting date. The charges were filed on March 24, 1988, and a preliminary hearing was scheduled for March 28, 1988. At that time appellant was serving a six month sentence in the

---

1. It may appear that because appellant was on his way to the M.V.A. to obtain his license I.D. that he had to know that his license was suspended. The testimony on this issue is very confusing. In piecing it together we conclude that at some point prior to the accident a police officer had taken possession of appellant's license I.D., presumably because appellant had not paid a ticket. Appellant testified that he had been notified by the District Court that if he paid the ticket he could retrieve his I.D. He further testified that he did not know that the M.V.A. had suspended his license and he denied receiving any notice of suspension.

Anne Arundel County Detention Center. For reasons not explained at the hearing, appellant was not transported to court on March 28, 1988 for his preliminary hearing. As a result, the hearing was postponed. No further action was taken in the case until May 6, 1988, when counsel entered his appearance.

■ Appellant argues that the State was responsible to produce him at the preliminary hearing, and because it did not do so it was the State's fault that the hearing was not held on March 28, 1988. Appellant further contends that he had a right to have his preliminary hearing on the day it was originally scheduled. He concludes that because it was the State's fault that the hearing was not held as originally scheduled, he is entitled to have the 180–day period begin the day the preliminary hearing was scheduled. As support for his position, appellant cites *Brady v. State*, 291 Md. 261, 434 A.2d 574 (1981); *Gee v. State*, 54 Md.App. 549, 459 A.2d 608 (1983) *reversed on other grounds*, 298 Md. 565, 471 A.2d 712 (1984); and *Strickler v. State*, 55 Md. App. 688, 466 A.2d 51 (1983) *cert. denied* 299 Md. 137, 472 A.2d 999 (1984). In these cases, criminal trials were delayed because the State failed to locate the defendant within the Maryland correctional system. The delay in each case was attributed to the State and their analysis rests on lack of prosecutorial diligence in producing an incarcerated individual for trial. These cases provide constitutional speedy trial analysis, but do not involve a determination of when the period for the running of 4–271 is triggered. *See, State v. Brown*, 307 Md. 651, 657, 516 A.2d 965 (1986) (Rule not intended to be codification of right to speedy trial). Md.Rule 4–271(a) clearly states that the 180–day period begins upon "the earlier of the appearance of counsel or the first appearance of the defendant before the circuit court pursuant to Rule 4–213." *See also Fuget v. State*, 70 Md.App. 643, 649, 522 A.2d 1371 (1987). Since no preliminary hearing was ever conducted, counsel's appearance on May 6, 1988 triggered the starting date. The fact that the State may by its

neglect have caused the preliminary hearing to have been postponed is irrelevant.

## II. Jury Instructions

Appellant contends that the trial judge erred when he refused to instruct the jury that, in order to convict appellant of the charges, the jury had to be convinced that appellant possessed criminal intent—*mens rea.* Appellant asserts that the trial court erroneously interpreted all of the charges as strict liability offenses.

■ Trial judges are required, upon the request of any party, to instruct the jury as to the applicable law and to give a requested instruction which correctly states the law if it has not been fairly covered in the instructions actually given. Md.Rule 4–325; *Lansdowne v. State*, 287 Md. 232, 412 A.2d 88 (1980). Trial judges are not, however, required to give instructions in the precise language requested by counsel. An instruction is sufficient if it fairly covers all of the points of law contained in the requested instruction. *Smith v. State*, 66 Md.App. 603, 621, 505 A.2d 564 *cert. denied*, 306 Md. 371, 509 A.2d 134 (1986).

■ At common law, conviction of a crime required proof of *mens rea.*[2] Legislatures in this century have imposed criminal liability without the requirement of *mens*

---

2. *Mens rea*—a guilty mind—plus the prohibited act were the two elements necessary before one could be convicted of a crime. *Actus non facit ream, nisi mens sit rea,* "an act does not make [the doer of it] guilty, unless the mind be guilty; that is unless the intention be criminal. The intent and the act must both concur to constitute the crime." (Citations omitted.) Black's Law Dictionary, Rv. 4 ed., (1968) p. 55. Historically, if *mens rea* were not proven there could be no conviction. Judge Learned Hand defined *mens rea:*
    "Ordinarily one is not guilty of a crime unless he is aware of the existence of all those facts which make his conduct criminal. That awareness is all that is meant by the mens rea, the 'criminal intent,' necessary to guilt, as distinct from the additional specific intent required in certain instances ... and even this general intent is not always necessary."
    Quoted in *Clark and Marshall, supra,* at 268, in turn *U.S. v. Crimmins,* 123 F.2d 271, 272 (2nd Cir.1941).

*rea* for "regulatory" or "public welfare offenses".[3] C. Torcia, *Wharton's Criminal Law* § 23, 14th ed. at 100–111, 106 (1978); *Clark and Marshall Crimes*, 7th ed. at 303–307. These strict liability offenses were tailored to alleviate the unique problems created by the industrial revolution. *Dawkins v. State*, 313 Md. 638, 547 A.2d 1041 (1988), *citing Morissette v. United States*, 342 U.S. 246, 254, 72 S.Ct. 240, 245, 96 L.Ed. 288 (1951).

The United States Supreme Court has defined public welfare offenses as those which "depend on no mental element but consist only of forbidden acts or omissions." *Morissette v. United States*, 342 U.S. 246, 252–253, 72 S.Ct. 240, 244, 96 L.Ed. 288 (1952).

"Public Welfare Offenses" are generally regulatory in nature. The earliest cases involved liquor and adulterated milk. *See, e.g., Barnes v. State*, 19 Conn. 398 (1849); *Commonwealth v. Boynton*, 2 Allen 160 (Mass. 1861). Later cases expanded the doctrine to apply to violations of traffic regulations and motor vehicle laws, sales of misbranded articles, and sales or purchases in violation of anti-narcotics laws. *See,* Sayre, *supra,* 33 Colum.L.Rev. at 73. These offenses commonly involve light fines or penalties. *Morissette v. United States, supra,* 342 U.S. at 256, 72 S.Ct. at 246. As Sayre notes, "... the penalty in such cases is so slight that the courts can afford to disregard the individual in protecting the social interest." Sayre, *supra,* 33 Colum.L.Rev. at 70. *Dawkins, supra,* 313 Md. at 644–645, 547 A.2d 1041.

The omission of the *scienter* requirement for motor vehicle offenses was a reaction to the dangers and problems caused by the increased use of motor vehicles and the dangers attendant thereto. As the Supreme Court observed in *Morissette v. United States, supra* (1952), "[t]raffic of velocities, volumes and varieties unheard of

---

**3.** These were usually those offenses which are *mala prohibita,* created and prohibited by statutes as contrasted with offenses *mala in se,* those which are wrong in themselves.

came to subject the wayfarer to intolerable casualty risks if owners and drivers were not to observe new cares and uniformities of conduct." *Accord, Wharton's Criminal Law, supra,* at 109–110; *Dawkins v. State, supra;* R.M. Perkins, *Criminal Law,* 2d ed. at 802 (1969); Mueller, *How to Increase Traffic Fatalities: A Useful Guide For Modern Legislators and Traffic Courts,* 60 Colum.L.Rev. 944, 959 (1969); Robinson, *Element Analysis in Defining Criminal Liability: The Model Penal Code and Beyond,* 35 Stan.L.Rev. 681, 701 (1983).

The imposition of strict liability for public welfare offenses is currently disfavored by both commentators and a number of courts. "The scholarly comment opposing imposition of criminal sanctions for strict liability offenses is overwhelming." Robinson, *supra,* n. 88 at 701.

■ While the United States Supreme Court notes this opposition to criminal offenses requiring no *mens rea, Liparota v. United States,* 471 U.S. 419, 426, 105 S.Ct. 2084, 2088, 85 L.Ed.2d 434 (1985), it recognizes that the definition of the elements of a criminal offense is entrusted to the legislature, *id.* at 425, 105 S.Ct. at 2088. *Liparota* reconciles the significant elimination of explicit *mens rea* requirement in criminal statutes with the need to follow legislative intent by implicitly creating a presumption that *mens rea* is required in criminal cases. To hold that a statute does not require the element of intent necessitates that there be a clear indication to that effect from the legislature.

Absent indication of contrary purpose in the language or legislative history of the statute, we believe that § 2024(b)(1) requires a showing that the defendant knew his conduct to be unauthorized by statute or regulations. "The contention that an injury can amount to a crime only when inflicted by intention is no provincial or transient notion. It is as universal and persistent in mature systems of law as belief in freedom of the human will and a consequent ability and duty of the normal individual to choose between good and evil." *Morissette v. United*

*States, supra,* 342 U.S., at 250, 72 S.Ct., at 243. Thus, in *United States v. United States Gypsum Co.,* 438 U.S. 422, 438, 98 S.Ct. 2864, 2874, 57 L.Ed.2d 854 (1978), we noted that "[c]ertainly far more than the simple omission of the appropriate phrase from the statutory definition is necessary to justify dispensing with an intent requirement" and that criminal offenses requiring no *mens rea* have a "generally disfavored status." Similarly, in this case, the failure of Congress explicitly and unambiguously to indicate whether *mens rea* is required does not signal a departure from this background assumption of our criminal law.

*Id.* at 425–426, 105 S.Ct. at 2088.

█ Appellant suggests that in *Dawkins v. State,* 313 Md. 638, 547 A.2d 1041 (1988) the Court of Appeals rejected the application of strict liability to criminal offenses in this State. We disagree. While *Dawkins* acknowledged that the contemporary view disfavors imposition of strict liability, *id.* at 650, 547 A.2d 1041, it applied traditional statutory construction to determine and follow the intent of the legislature. In general, whether *scienter* is a necessary element of a statutory crime is a question of legislative intent to be answered by a construction of the statute. *McIntosh v. Washington,* 395 A.2d 744, 756 (D.C.App.1978).

In *Dawkins,* the appellant successfully challenged this Court's interpretation of the Maryland Controlled Substances Act by which we found that *scienter* was not an element of the crime of possession of a controlled substance. The Court of Appeals observed that the express language of the statute was silent as to *scienter, id.* at 645–646, 547 A.2d 1041. The Court then examined the entire statutory scheme and surveyed the law of other states which had adopted the Uniform Controlled Substances Act and held that, with regards to drug possession, *scienter* was an element of the crime.

The sections of the Transportation Article considered *sub judice* do not expressly require *scienter.* While a statute's

explicit language is an obvious manifestation of legislative intent, the overall statutory scheme and the nature of its provisions also indicate the legislature's purpose. In *Dawkins, supra,* the Court of Appeals utilized the following three factors as indicia of whether the legislature intended to create a public welfare offense:

1. Public welfare offenses are generally regulatory rather than punitive in nature.

2. Such offenses usually carry a penalty which is "so slight that the courts can afford to disregard the individual in protecting the social interest." They typically carry light fines or penalties.

3. An individual charged with such a crime is generally in a position to prevent its violation. *Dawkins, supra,* at 644–45, 547 A.2d 1041 (citations omitted). *See also,* LaFave and Scott, *Basic Premises of Criminal Law* at 219–220.

Appellant McCallum was convicted of six violations of the Transportation Article.[4] After an examination of the over-

---

**4.** Appellant was convicted of the following provisions of the Md. Transportation Code Ann.:

*§ 13–401*

(b) Driving unregistered vehicles.—If a vehicle is not registered, a person may not drive the vehicle on a highway in this State.

*§ 13–409*

(b) Display of registration card upon demand of officer.—On demand of a police officer who identifies himself as a police officer, an individual who is driving or in control of a vehicle shall display a registration card that refers to the vehicle.

*§ 13–703*

(f) Unauthorized display of registration card.—A person may not display on or for a vehicle any registration card that is neither:

(1) Issued for the vehicle; or

(2) Otherwise lawfully used on or for the vehicle under this title.

(g) Unauthorized display of registration plate.—A person may not display on or for a vehicle any registration plate that is neither:

(1) Issued for the vehicle; or

(2) Otherwise lawfully used on or for the vehicle under this title.

*§ 16–112*

(c) Display to uniformed police officers.—Each individual driving a motor vehicle on any highway in this State shall display the license to any uniformed police officer who demands it.

*§ 16–303*

all statutory scheme, its penalty provisions, and the position of a defendant charged with its violation, we find that the legislature's intent regarding *mens rea* is not uniform for the six sections under which appellant was convicted.

Five of appellant's convictions are for the following misdemeanors: driving an unregistered vehicle, § 13–401(b); failure to display a registration card and plate, § 13–703(f), (g); failure to display a license to an officer, § 16–112(c); and failure to display registration card to an officer, § 13–409. While a trial court has some discretion in setting the amount of the fine for these violations the legislature mandates that it is not to exceed $500.00, § 27–101(b). This monetary fine is slight when considered in light of the State's interest in keeping roadways safe and protecting human life. The harm to the public resulting from a violation of these provisions is potentially quite great. Automobiles and other motor vehicles recklessly and incompetently driven can cause both destruction to property and the loss of human life, therefore, uniform regulation of traffic is necessary and designed to protect the public. The purpose of the motor vehicle code is to regulate traffic and is not criminal in nature. *Byrd v. State*, 13 Md.App. 288, 283 A.2d 9 (1971). The monetary fines enhance the regulatory scheme by creating negative incentives for compliance. Their role is, therefore, regulatory rather than punitive.

It is relatively easy for an individual to conform his conduct to the constraints of the code. As the Supreme Court observed in *Morissette, supra,* 342 U.S. at 256, 72 S.Ct. at 246, with regard to public welfare offenses in general, an individual "if he does not will the violation, usually is in a position to prevent it with no more care than society might reasonably expect and no more exertion than

---

(c) Suspended license generally.—A person may not drive a motor vehicle on any highway or on any property specified in § 21–101.1 of this article while the person's license or privilege to drive is suspended in this State.

it might reasonably extract from one who assumed his responsibilities." Any individual who is licensed to operate a motor vehicle in Maryland must be examined by the state. The licensing procedure requires a test of the applicant's vision, ability to read traffic signs, as well as his knowledge of the traffic laws of the state.

We conclude that the legislature did not intend *mens rea* to be an element of the offenses under § 13–401(b), § 13–409(b), § 13–703(f), (g) and § 16–112(c). Liability violation may be properly imposed without regard to fault.

The severity of the penalty provision for driving while a license is suspended under § 16–303 is significant and distinguishes it from the other five provisions penalized only by monetary fines.[5] While the sole imposition of a fine for most misdemeanors under the article suggests that the

---

5. A number of states have addressed the question of whether *scienter* is a required element of the statutory crime of driving with a suspended or revoked license, and the results have not been uniform. The following is only a partial catalog of cases which hold that *mens rea* is an element: *Jeffcoat v. State,* 639 P.2d 308 at 312, 313 (Ak., 1982) (Where statute is silent, element of *mens rea* must be read by implication.); *Jolly v. People,* 742 P.2d 891, 893 (Colo., 1987) (Knowledge of revocation is an element of this crime under Colorado statute.); *State v. Green,* 351 N.W.2d 42 (Mn., 1984) (Minnesota statute read to require a willful violation.); *Zamarripa v. First Judicial District Court,* 103 Nev. 638, 747 P.2d 1386, 1389 (1987); *Alexander v. State,* 712 P.2d 416, 419 (Ak.App., 1986).

The following cases hold that *scienter* is not an element: *State v. Grotzky,* 222 Neb. 39, 382 N.W.2d 20 (1986) (Crime of driving motor vehicle during suspension does not require intent.); *State v. Fridley,* 335 N.W.2d 785, 788 (N.D., 1983) (North Dakota statute providing penalty for driving while license is suspended or revoked does not contain a mental culpability requirement.); *State v. Wenof,* 102 N.J.Super. 370, 246 A.2d 59, 62 (1968) (New Jersey legislature did not intend *mens rea* to be an element of the crime of driving while license is revoked.); *State v. Antonsen,* 525 A.2d 1048 (Me., 1987) (Violation of statute prohibiting operation of vehicle after suspension does not require culpable mental state.); *State v. Buttrey,* 293 Or. 575, 651 P.2d 1075, 1077 (1982); *State v. Baltromitis,* 242 A.2d 99 (Ct., 1967); *State v. Keihn,* 530 N.E.2d 747, 748 (Ind.App., 1988); *State of Oregon v. Johnson,* 70 Or.App. 403, 689 P.2d 1032, 1035 (1984); *State v. Morrison,* 2 Ohio App.3d 364, 442 N.E.2d 114, 118 (1982); *People v. Stevens,* 125 Ill.App.3d 854, 81 Ill.Dec. 519, 466 N.E.2d 1321 (1984).

legislature intended them to be strict liability offenses, we do not reach the same conclusion where the crime is penalized by incarceration. The penalty for a first offense under § 16–303 is a fine of not more than $1,000 or imprisonment of not more than one year or both; for a second offense incarceration may be for two years or a fine of $1,000 or both, § 27–101(h). Any subsequent offense may be punishable by a fine of not more than $1,000, imprisonment of not more than two years or both. *Id.* One of the punishments imposed for this violation, a prison term, suggests that *mens rea* should be an element of this offense. Pellucidly, incarceration is punitive rather than regulatory in nature. Such a sentence, furthermore, is much more serious than the "light fines" which are generally recognized in public welfare offenses.

The overall statutory scheme leads us to hold that *mens rea* is an element of the crime of driving while a license is suspended. While the Motor Vehicle Administration (MVA) is authorized to suspend a license, the grounds for suspension are limited, § 16–206(a). Suspension generally must be predicated by written notice to the applicant or licensee from the Administration; an individual may then request a hearing. The MVA may immediately suspend a license only where there is a likelihood of substantial and immediate danger and harm to the licensee or others if the license is continued pending a hearing. Such an individual is entitled to a hearing on the suspension within seven days after it is requested, § 16–206(c)(2)(ii), (iii). The legislative scheme, *supra*, requires that an individual know that his license was suspended before he can commit the crime of driving with a suspended license. We agree with the Supreme Court of Colorado which reviewed similar notification provisions in a statute proscribing driving while a license is revoked. It concluded that notification provisions express legislative intent that knowledge be an element of the offense: "There would be little purpose in the legislature's requiring the various forms of notice revocation … if it did not intend that knowledge of the fact of revocation was to

be an essential element of the crime." *Jolly v. People,* 742 P.2d 891, 894 (Colo.1987).

These additional notice provisions represent a recognition by the legislature that the penalty of suspension is a severe one. They demonstrate that it is possible for one's license to be suspended without knowledge. Suspension may be immediate and without notice if the agency deems an individual to pose a serious risk to the public. It is also possible that written notice may not be received by the individual due to clerical or postal error. Similarly, as is asserted in this case, it is possible that an individual's change of address may result in failure to receive actual notice of suspension.

■ We conclude that *mens rea* is not an element of § 13–401(b), § 13–409(b), § 13–703(f), (g), § 16–112(c), as these offenses carry light fines, the potential harm to the public is great and an individual is easily able to prevent violation.[6] With regard to driving with a suspended license under § 16–303, we hold that *mens rea* is required.[7] The jury instructions with regard to this violation were in error.

### III.  Driving Record

During his questioning of Officer Rudiger, the prosecutor offered appellant's driving record into evidence. The record showed that his license to drive was suspended. It also

---

**6.** This does not prevent a court under a special set of circumstances from acquitting a defendant.

**7.** We hasten to add that proof of MVA's compliance with its own procedure in accordance with Md.Transportation Code § 12–114 by which notice of suspension is sent to the licensee may, depending on the facts of the case, provide strong proof of the presence of *mens rea.* *See* fn. 2 at p. 410, *supra.*

Based on our reading of Md.Transportation Code § 12–114(c), it is not necessary for the entire driving record to be introduced. Written certification will suffice. § 12–114(c) provides:

Proof that notice has been given may be made by the certificate of any officer or employee of the Administration or the affidavit of any adult, naming the person to whom the notice was given and stating the time, place, and manner of giving the notice.

included three pages filled with numerous prior motor vehicle violations. Some of these entries were highlighted with a yellow pen. Defense counsel objected that the record should not be admitted because of the highlighting. The trial judge overruled counsel's objection and admitted the record. After all the evidence was presented and the case was about to be submitted to the jury, the trial judge informed counsel that he had solved the problem. He explained that he had had the record photostated and that in the copying process the highlighting was deleted. Counsel then, for the first time, argued that the driving record should be excluded from the evidence because it contained "irrelevant information" regarding appellant's other offenses. The trial judge refused to exclude the evidence and appellant now argues that his failure to do so constituted error.

Md.Rule 4–323(a) requires that "[a]n objection to the admission of evidence shall be made at the time the evidence is offered or as soon thereafter as the grounds for objection become apparent. Otherwise, the objection is waived." Because appellant objected when the report was offered, and at a time when the trial court could have corrected the error, we hold that the issue was preserved for our review.

Because the appellant's driving record contained an extensive list of prior motor vehicle violations, we hold that its admission into evidence was prejudicial. While the entries in the record directly relating to the violations at issue were admissible, the remaining entries were not. Since the State showed no relevant purpose for the admission of the other driving infractions other than to show the appellant's propensity to commit such infractions, the evidence was clearly inadmissible. *State v. Faulkner,* 314 Md. 630, 552 A.2d 896 (1989). Accordingly we hold that it was prejudicial error for the court to have admitted the driving record.

JUDGMENTS REVERSED; COSTS TO BE PAID BY ANNE ARUNDEL COUNTY.