686 A.2d 690

**Sabina E. ACQUAH**

v.

**STATE of Maryland.**

**No. 261, Sept. Term 1996.**

Court of Special Appeals of Maryland.

Dec. 26, 1996.

M. Albert Figinski (Weinberg and Green LLC, on the brief), Baltimore, for Appellant.

Annabelle L. Lisic, Assistant Attorney General (J. Joseph Curran, Jr., Attorney General, Carolyn J. McElroy and Timothy U. Sharpe, Assistant Attorneys General, on the brief), Baltimore, for Appellee.

Argued before CATHELL, DAVIS and HARRELL, JJ.

**38**

HARRELL, Judge.

Appellant, Sabina Evelyn Acquah (Acquah), was indicted on two criminal conspiracy counts. One count charged Acquah with conspiracy[1] to bribe state employees under Md. Ann.Code art. 27, § 22[2] (hereinafter referred to as "the bribery count"). The second count charged Acquah with conspiracy to gain illegally access to personal records by false pretenses, bribery, or theft (hereinafter referred to as "the personal record count").[3] Acquah was acquitted by a jury sitting in the Circuit Court for Baltimore City (Hammerman, J., presiding) on the bribery count but convicted on the personal record count. She appeals her conviction on several fronts. We shall affirm.

## FACTS

This case evolved out of the apparently frenzied market for inclusion of Maryland's Medicaid recipients in managed care programs, particularly health maintenance organizations[4]

---

1. Punishment for the crime of conspiracy, set forth at Md. Ann.Code art. 27, § 38, "shall not exceed the maximum punishment provided for the offense he or she conspired to commit." The substantive crime of conspiracy is a misdemeanor at common law. *E.g., Wallach v. Board of Educ.*, 99 Md.App. 386, 391, 637 A.2d 859 (1994); *Jones v. State*, 8 Md.App. 370, 259 A.2d 807 (1969).

2. The statute provides, in relevant part:

 If any person shall bribe or attempt to bribe ... any officer or employee of the State ... in order to influence any such officer or person in the performance of any of his [or her] official duties ... every such person ... shall be deemed guilty of bribery, and on being convicted thereof shall be fined not less than $100 nor more than $5,000, or, in the discretion of the court, shall be sentenced to be imprisoned in the penitentiary of this State for not less than two nor more than 12 years, or both fined and imprisoned....

3. The statute dictates that "a person may not ... by false pretenses, bribery, or theft, gain access to or obtain a copy of a personal record whose disclosure to the person is prohibited...." Md. State Gov't Code Ann. § 10–627(a)(3).

4. See *Patel v. HealthPlus, Inc.*, 112 Md.App. 251, 684 A.2d 904 (1996) for what may be the most extensive treatment of the history and

(HMO's). Without mandatory enrollment legislation allowing access to potential client information, the private entities were often perplexed as to how to enroll Medicaid recipients without access to State-controlled listings. The State, we presume unintentionally, created a lucrative market without providing an efficient, yet legal, means of finding members of that market. Although the State desired that private companies enroll its Medicaid recipients, it did not provide access to recipient records. The Department of Health and Mental Hygiene (DHMH) maintains the recipient information on internal forms known as HEO1's. This potentially lucrative market, albeit one created by the State, spawned an environment that included bribery of DHMH employees to release HEO1's as a means to obtain "leads" on possible clientele. This use of the HEO1's by certain HMO marketing representatives led to the Medicaid Fraud Control Unit (MFCU) investigations that, in turn, led to the indictment of Acquah.

Chesapeake Health Plan (CHP) is an HMO operating in Maryland. Acquah became an employee of CHP in 1988 and, at some point thereafter, became the Medicaid Marketing Manager. During the alleged conspiracy, she had supervisory responsibility for all CHP employees marketing services to Medicaid recipients. The issue addressed below was whether Acquah conspired to obtain illegally the HEO1's from State employees in order to enhance the performance of the Medicaid Marketing Department at CHP.

Acquah's subordinates worked out of two offices, one in Baltimore City and another in Prince George's County. The representatives were required to report in the morning to their assigned office, venture into the marketing thicket to enroll Medicaid recipients, and return to the office shortly before the end of the work day. Acquah managed her employees through direct contact and by addressing them at bi-weekly meetings.

---

operations of Health Maintenance Organizations available in a reported opinion of an appellate court of this State.

The MFCU obtained a subpoena duces tecum directed to the Custodian of Records at CHP. On 15 March 1995, after an attempt to serve CHP's general counsel, a MFCU investigator served the subpoena on Acquah. Among the many documents requested were HEO1's. Officers of CHP and Acquah both testified that before service of the subpoena they had no knowledge of the existence or significance of HEO1's. It was later demonstrated at trial that HEO1's were single sheets of paper, maintained by DHMH, that contained personal information about individual Medicaid recipients. The face of an HEO1 does not proclaim its confidentiality and numerous witnesses at trial denied knowledge of its confidential status.

CHP, and its counsel, conducted a search of the Medicaid Marketing Department's offices and discovered HEO1's in approximately one-third of the representatives' cubicles. CHP followed up the search with interrogations of the representatives and supervisors. A number of these individuals were ultimately summoned by the grand jury and admitted to using HEO1's. Most of these persons were fired. Acquah was interrogated separately and denied knowing that HEO1's were used at CHP. She also denied ever distributing HEO1's.

Acquah was later indicted on the two conspiracy counts that were the subject of the trial below. The State alleged that Acquah was part of an ongoing conspiracy to obtain the HEO1's from state employees. Apparently four representatives illegally obtained the HEO1's, although only one admitted actually to paying State employees to obtain them. The State never alleged that Acquah personally bribed its employees or directly took part in any substantive crime. She was charged strictly as a co-conspirator. After her indictment, CHP placed Acquah on unpaid leave.

Acquah's trial encompassed six days. The testimony received indicated that several former employees had observed use of HEO1's at CHP. They testified that Acquah, at the biweekly meetings, instructed her staff concerning concealing "leads" in order to keep potential enrollees from discovering that the representatives had confidential information. One

exchange between the prosecutor and a witness occurred as follows:

Q. And do you recall in any of these meetings Sabina Acquah saying anything about HEO–1 screens?

A. The only thing I ever heard her say is they [were] getting [a lot] of complaints of how marketing reps knew all this information on people, and they, you know, how did they get these informations (sic). And there was a couple of times that she said in a meeting that if you are using these things, leave them in your cars. Don't take them in those people's houses. You maybe can copy them but they are never to see the papers, do something, but do not take them into people's office (sic).

Q. When Sabina Acquah said this, you used the words, these things; do you recall what words she used?

A. HEO–1, leads, either/or.

THE COURT: HEO–1's or what?

A. Or leads.

THE COURT: Leads.

Q. At Chesapeake in the Medicaid Marketing Department what things were referred to as leads?

A. HEO–1's, a call in, if someone called in inquiring about a plan, if someone was disenrolled or lost eligibility, you know, if that is a plan they already owned, you can go back out and try to resell them the plan.

Q. Did anyone ever tell you to take the—not to take the referral from another marketing representative into someone's house?

A. Not unless they, if another marketing representative gave you a HEO–1, don't take that in.

Other witnesses testified that Acquah told them not to go into the enrollees' homes with the leads.

Other testimony indicated that Acquah told at least one marketing representative to get some of "those things going around". Her alleged co-conspirator testified that his request of Acquah for reimbursement for the purchase of HEO1's was

denied. She also apparently vowed to deny knowledge of the HEO1's if they were uncovered. Yet another representative testified that Acquah gave out HEO1's with a gesture that indicated, at least to that representative, that Acquah knew her actions were wrong. Additionally, the record is full of testimony that demonstrates that Acquah knew of the illegal conduct occurring in her department and failed to take decisive action to stop it.

Acquah did refute these witnesses with her own testimony and that of other witnesses. Acquah testified that legitimate "leads" came into the hands of her representatives and that these are the "things" she warned against taking into the enrollees' homes. Acquah's supervisor testified he believed that Acquah did not know the HEO1's were being used in the department.

## ISSUES

I. Did the jury's acquittal on the bribery count dictate acquittal on the personal records count thereby requiring reversal?

II. Did the State present evidence sufficient to convict Acquah on the personal records count?

III. Did the trial court's instructions to the jury regarding the law of conspiracy constitute reversible error?

IV. Should the trial court's determination that the jury selection process was properly conducted be upheld?

V. Did the trial judge act improperly so as to deny Acquah a fair trial?

## I.

Before considering the merits of Acquah's first argument, we note that this issue has not been preserved for appeal. When a defendant contends that a jury's verdicts are inconsistent or improper, he or she must raise the issue at trial. *See Bell v. State,* 220 Md. 75, 81, 150 A.2d 908 (1959); *Cross v. State,* 36 Md.App. 502, 506, 374 A.2d 620 (1977), *rev'd on other grounds,* 282 Md. 468, 386 A.2d 757 (1978); *see also*

*Hawkins v. State,* 87 Md.App. 195, 589 A.2d 524, *rev'd on other grounds,* 326 Md. 270, 604 A.2d 489 (allowing appeal absent objection at trial because the defendant was convicted on both counts and was sentenced on both). Under Md. Rule 4–323 and Md. Rule 8–131, this Court will not decide issues unless they plainly appear to have been decided below. Because appellant did not raise the issue of an inconsistent jury verdict below, we are not required to decide it now. We shall, however, decide that, even if the issue had been preserved for appeal, the jury's verdicts were not inconsistent.

Acquah essentially argues that the jury's acquittal on the bribery count necessarily dictates acquittal on the personal records count. First, she asserts that because she can only be tried for one conspiracy, the acquittal on the first conspiracy count precludes any subsequent conspiracy conviction. She further contends that the elements for conspiracy to bribe are also essential to the personal records count, and, therefore, the acquittal on the first count eviscerated the second. Her argument, precariously perched on artful, if not convincing, legal analysis, is easily toppled.

In both counts, the State charged Acquah with conspiracy. Conspiracy, a common law misdemeanor, is defined as a combination by two or more persons to accomplish a criminal or unlawful act or acts, or to do a lawful act by criminal or unlawful means. *Mason v. State,* 302 Md. 434, 444, 488 A.2d 955 (1985); *Wallach v. Board of Educ.,* 99 Md.App. 386, 391, 637 A.2d 859, *cert. granted,* 336 Md. 98, 646 A.2d 1018 (1994); *see also Hurwitz v. State,* 200 Md. 578, 92 A.2d 575 (1952) (characterizing conspiracy as complete without any overt act). The State properly charged Acquah with participating in a singular conspiracy. A single agreement to engage in criminal conduct does not amount to several conspiracies because the agreement contemplated several offenses. *Mason,* 302 Md. at 445, 488 A.2d 955. Even though the underlying illegal subject matter of the conspiracy may have been two separate statutory crimes, Acquah was charged with participating in one common law conspiracy. Acquah

could, therefore, only be convicted on one of the conspiracy counts. It does not follow, however, that an acquittal on any one conspiracy count results in an acquittal on both.[5]

Appellant fails to acknowledge that a single conspiracy may be charged in several counts to meet different interpretations that might be placed upon the evidence by the jury. *See United States v. Maryland State Licensed Beverage Ass'n,* 240 F.2d 420 (4th Cir.1957). The State charged Acquah with conspiring with another person to do some illegal act. The multiple counts allowed the jury to weigh the evidence and determine what, if any, criminal act Acquah agreed to commit. The State acknowledged that Acquah could not be convicted on both counts. At the State's request, the trial judge instructed the jury that it should not proceed to consider the personal record count if it found Acquah guilty of conspiracy to bribe. Both the State and the trial judge recognized that a jury might, as the jury in the instant case apparently did, reject the argument that Acquah engaged in a conspiracy contemplating bribery of state employees. The personal record count, therefore, gave the jury the option of convicting Acquah of conspiracy to otherwise illegally obtain the confidential documents. The State charged Acquah with a single conspiracy in two different counts thereby recognizing the different interpretations that could be placed upon the evidence by the trier of fact. Doing so was entirely proper. *See Ezenwa v. State,* 82 Md.App. 489, 500–02, 572 A.2d 1101 (1990) (deciding that multiple counts are not fatal to convictions, but defendant can only be convicted and sentenced on one of the

---

**5.** Although true that there was only evidence of one conspiracy, the meeting of the minds required for each conspiracy count is distinct from the other. Acquah's contention, that acquittal on any one conspiracy count eviscerates all other conspiracy counts, provides an absurd result. With only one conspiracy, she could not be convicted on more than one count. If we adopted her argument, she, and others like her, could never be convicted of conspiracy any time the State brought its charges in multiple counts. We conclude that this result is neither desired nor compelled by law. There are many instances, and the instant case is one of them, in which the State must bring conspiracy charges for a singular conspiracy in multiple counts.

counts). Acquah's single conspiracy argument asserts that an acquittal on the bribery count inherently dictates that there was no conspiracy. Using her flawed logic, it would follow that a conviction on either count is inconsistent with an acquittal on the other. As explained above, the verdicts were not inconsistent.

 Even if we were to assume that the two verdicts were inconsistent, the doctrine of inconsistent jury verdicts would mitigate against reversal. "While it is true that a finding of guilt on two inconsistent counts will be declared invalid in Maryland, ... it does not follow that a conviction on one count may not stand because of an inconsistent acquittal on another count". *Leet v. State,* 203 Md. 285, 293, 100 A.2d 789 (1953) *quoted in State v. Moulden,* 292 Md. 666, 681, 441 A.2d 699 (1982). Acquah acknowledges that we traditionally recognize the validity of inconsistent jury verdicts. She suggests, however, that the rule should not apply to the inchoate crime of conspiracy because, as previously discussed, Acquah could only be convicted of one conspiracy. We disagree and shall not create an exception to the doctrine of inconsistent jury verdicts. We see no compelling reason to stray from the doctrine as it now stands.

 Acquah's second theory turns on a double jeopardy analysis. She argues that bribery is a lesser offense included in the personal record count. Her acquittal on the lesser included offense, she contends, mandates acquittal on the greater offense.[6] She fails to recognize that, although bribery is included in the personal record count, it is not an essential element. We cannot be certain which element of

**6.** In a double jeopardy analysis, acquittal on a lesser included offense precludes subsequent conviction on the greater offense. *Burkett v. State,* 98 Md.App. 459, 471, 633 A.2d 902 *cert. denied,* 334 Md. 210, 638 A.2d 752 (1994). A greater offense "is not necessarily the offense for which the greater penalty is provided; it is the offense with the additional element or elements...." *Lancaster v. State,* 86 Md.App. 74, 80–81, 585 A.2d 274 (1991), *aff'd,* 332 Md. 385, 631 A.2d 453 (1993).

conspiracy to bribe the State failed to prove.[7]

Although interpreting the evidence is the province of the jury, if the crimes charged in both counts were the same, Acquah could not be convicted of one and acquitted of the other. In judging whether crimes in different counts are the same, the court will determine whether each count contained the same elements and would require the same evidence to convict. *Weinecke v. State*, 188 Md. 172, 52 A.2d 73 (1947); *Smith v. State*, 31 Md.App. 106, 355 A.2d 527 (1976). If elements of the first count are entirely contained in the second count, then acquittal on the first requires acquittal on the second. In *Bryant v. State*, 229 Md. 531, 185 A.2d 190 (1962), for example, the Court overturned a criminal conviction on a "second offender" statute. The appellant was acquitted of unlawful possession of heroin but convicted of another count that included the same elements as the first plus his prior conviction for possession of drug paraphernalia. All of the elements in the first charge were essential to conviction on the second. The *Bryant* case differs from the circumstances facing Acquah in two regards. First, Acquah was charged with conspiracy and not the underlying substantive crimes. Both counts, therefore, require an agreement, or meeting of the minds, but neither requires precisely the same agreement. Therefore, all of the elements of the crime for which she was acquitted are not contained in the crime for which she was convicted. Additionally, the personal record count, at least in theory, could have been proven through any one of three theories. The bribery element is not essential to conviction. We shall explain.

---

7. We further note that, in the instant case, the jury made no findings of fact. We shall not infer from their not guilty verdict that they found that all of the conspiracy to bribe elements did not exist. We can not hope to determine which or how many of the elements of the bribery count the State failed to prove. A finding of non-existence of any one element of conspiracy to bribe would mandate acquittal. We will not supplant our judgment for the jury's to determine the factual implications of their verdict. We decline the invitation to so invade what is the traditional province of the jury.

The first count, using the language of the bribery statute, Md. Ann.Code art. 27, § 22, amounts to a charge of conspiracy to bribe a public official. That count has essentially three elements:

1) Conspiracy to;

2) Bribe.

3) a public official.

The crime charged in the personal record count is prohibited by Md. State Gov't Code Ann. §§ 10–611 to –627. The State charged Acquah with:

1) Conspiracy to;

2) gain access to or a copy of;

3) personal records regarding Maryland Medicaid Assistance recipients; by

4) a) false pretenses,

 b) bribery, or

 c) theft.

Any one of the last three "theories" composing the fourth element of the second count, i.e. false pretenses, bribery, or theft, is sufficient to satisfy the element. Because Maryland's definition of bribery has remained consistent,[8] we conclude that bribery, as used in Md. State Gov't Code Ann. §§ 10–611–627 and the personal record count, contains the same elements and requires the same proof as the crime charged in the bribery count. Simply put, Acquah's acquittal on the bribery count prevented her subsequent conviction on the personal record count based on a bribery theory. Failure to prove bribery as a whole in the first count prohibits its use as a part of the whole in the second. *See Burkett v. State,* 98

---

**8.** The bribery statute is merely a declaration of the common law of bribery and is not more inclusive. *Blondes v. State,* 16 Md.App. 165, 294 A.2d 661 (1972), *rev'd on other grounds,* 273 Md. 435, 330 A.2d 169 (1975). The statute embodies only the common law of bribery and does not extend to include other crimes, including the common law larceny crimes. *See State v. Canova,* 278 Md. 483, 365 A.2d 988 (1976).

Md.App. 459, 471, 633 A.2d 902 (1993), *cert. denied,* 334 Md. 210, 638 A.2d 752 (1994).

With a bribery theory unavailable to the State, and because it concedes that no evidence of false pretenses was ever offered at trial, the only viable theory is theft. Theft is a crime clearly defined by statute. Md. Ann.Code art. 27, § 342. The legislature created the theft statute to consolidate, in a single statutory scheme, the various common law larceny related crimes. *State v. Burroughs,* 333 Md. 614, 636 A.2d 1009 (1994). The theft statute was in existence at the time of the passage of Md. State Gov't Code Ann. §§ 10–611–627 in which the term "theft" was employed. We must consider the entire statutory scheme in our interpretation in tune with logic and common sense. Additionally, if the words of the statute are clear and unambiguous, our search for the meaning of its language may begin and end with its plain meaning. *Long v. State,* 343 Md. 662, 667, 684 A.2d 445 (1996) (citing *In re Victor B.,* 336 Md. 85, 94, 646 A.2d 1012 (1994)); *State v. Montgomery,* 334 Md. 20, 24, 637 A.2d 1193 (1994); *Harris v. State,* 331 Md. 137, 145, 626 A.2d 946 (1993); *Mustafa v. State,* 323 Md. 65, 73, 591 A.2d 481 (1991). We shall presume the the legislature acted with knowledge of the theft statute when it enacted Md. State Gov't Code Ann. §§ 10–611 to –627. *E.g., State v. Bricker,* 321 Md. 86, 581 A.2d 9 (1990). We conclude, therefore, that "theft", as used in Md. State Gov't Code Ann. §§ 10–611–627, is the same as the crime defined by the theft statute.

We note that it was also necessary to charge the crimes separately for sentencing purposes. The sentence for common law conspiracy may not exceed the sentence for the underlying crime. If convicted of conspiracy to bribe, Acquah faced a $5000 fine and twelve years in jail. The personal record count carried only a maximum punishment of a $1000 fine. Had the State charged Acquah with conspiracy to commit both crimes in one count, the trial court would not have been able to determine the appropriate sentence without invading the province of the jury.

## *II.*

In reviewing a claim of insufficiency of evidence, an appellate court must not decide whether it believes the evidence at trial established guilt beyond a reasonable doubt. The appellate court is required to affirm a conviction if, "... after viewing the evidence in the light most favorable to the prosecution, *any* rational trier of fact could have found the essential elements of a crime beyond a reasonable doubt." *Jackson v. Virginia,* 443 U.S. 307, 319, 99 S.Ct. 2781, 2789, 61 L.Ed.2d 560 (1979) *quoted in State v. Albrecht,* 336 Md. 475, 649 A.2d 336 (1994) (emphasis in original); *Oken v. State,* 327 Md. 628, 612 A.2d 258, *cert. denied,* 507 U.S. 931, 113 S.Ct. 1312, 122 L.Ed.2d 700 (1993); *State v. Raines,* 326 Md. 582, 606 A.2d 265, *cert. denied,* 506 U.S. 945, 113 S.Ct. 390, 121 L.Ed.2d 299 (1992); *Branch v. State,* 305 Md. 177, 502 A.2d 496 (1986).

As set forth in the discussion of Issue I, the personal record conviction is viable if the State produced sufficient evidence that Acquah:

1) Conspired to;

2) gain access to or a copy of;

3) personal records regarding Maryland Medicaid Assistance recipients; by

4) theft.

Acquah does not dispute that the State offered sufficient evidence satisfying elements two and three. She contends, however, that the State failed to produce evidence of both her participation in a conspiracy and theft. Much of Acquah's attack on the sufficiency of the evidence against her is based upon the notion that her mere association with the conspirators and knowledge of their activities was insufficient to make her a co-conspirator. Acquah contends that her managerial control over the conspirators is not tantamount to participation in the conspiracy. She fails to observe, however, that the conviction here need not be based upon Acquah's failure to police her subordinates, although this may also be evidence of her participation in the conspiracy. Her conviction turns

instead upon the evidence of her participation in a conspiracy to obtain information by theft and her actions consistent with that conspiracy.

The State was not required to show a formal agreement in order to prove conspiracy. It is sufficient if the parties tacitly come to an understanding regarding the unlawful purpose. *Quaglione v. State*, 15 Md.App. 571, 292 A.2d 785 (1972). In fact, the State was only required to present facts that would allow the jury to infer that the parties entered into an unlawful agreement. *Vandegrift v. State*, 82 Md.App. 617, 573 A.2d 56, *cert. denied*, 320 Md. 801, 580 A.2d 219 (1990). The concurrence of actions by the co-conspirators on a material point is sufficient to allow the jury to presume a concurrence of sentiment and, therefore, the existence of a conspiracy. *Hill v. State*, 231 Md. 458, 190 A.2d 795, *cert. denied*, 375 U.S. 861, 84 S.Ct. 127, 11 L.Ed.2d 88 (1963). Acquah argues that the State offered no evidence of a formal oral or written agreement between the conspirators. We conclude that was unnecessary. The State proffered sufficient evidence demonstrating Acquah's concurrence with the conspiracy by her actions and, perhaps even more detrimental to her cause, direct participation in the concealment of the continuing crime of theft. We need not, and therefore shall not, decide whether Acquah's role as supervisor makes her *per se* criminally liable for the actions of her subordinates. We note, however, that such an argument is not persuasive. We cannot go so far as to require, as the State may wish us to, that supervisors be held criminally liable if they fail properly to police employees or, for that matter, take any preventive measures concerning their subordinates. As we stated in *Jones v. State*, 8 Md.App. 370, 259 A.2d 807 (1969), "mere cognizance of the commission of a crime ... does not make the person having such knowledge, a co-conspirator of the criminal." *Id.* at 379, 259 A.2d 807. We are not seduced by the State's argument that Acquah's authority and means to discipline her subordinates, as well as her acceptance of substantial profits [9] from an

---

9. We observe that the State expended great effort at trial eliciting testimony regarding Acquah's substantial salary. We assume that this

unlawfully increased sales volume, were sufficient for the jury to have found her a willing participant in an unlawful agreement. The State offered two federal cases in support of this argument. *United States v. Misle Bus & Equip. Co.*, 967 F.2d 1227, 1236 (8th Cir.1992); *United States v. Gillen*, 599 F.2d 541, 547 (3d Cir.1979), *cert. denied*, 444 U.S. 866, 100 S.Ct. 137, 62 L.Ed.2d 89 (1979). These two federal antitrust cases support the notion that managerial inaction is sufficient to establish a criminal conspiracy. In federal price fixing actions, however, the underlying criminal "conduct is illegal *per se* ". *Gillen*, 599 F.2d at 547. The application of a *per se* rule for managers of companies charged with conspiracy to commit federal price fixing crimes stems, therefore, from the nature of the underlying substantive crimes. In any event, we do not consider federal antitrust cases as very persuasive in our analysis of Maryland conspiracy law.

> The common law crime of conspiracy in Maryland
>
> consists of the combination of two or more persons to accomplish some unlawful purpose by unlawful means. The essence of a criminal conspiracy is an unlawful agreement. The agreement need not be formal or spoken, provided there is a meeting of the minds reflecting a unity of purpose and design.

*Townes v. State*, 314 Md. 71, 75, 548 A.2d 832 (1988). There is no fissure in Maryland's common law of conspiracy in which to lodge a *per se* managerial conspiracy theory. We find more compelling the federal case offered by Acquah that decided "a defendant's mere association with conspirators is not enough to support a conspiracy conviction". *United States v. Austin*, 786 F.2d 986, 988 (10th Cir.1986). Certainly such a perspective is more consistent with the law of conspiracy as set forth

---

was a strategic attempt to dissipate any sympathy the jury may have had for the defendant. Lest there be any question, acquiring wealth is not and never has been a crime in the State of Maryland.

in *Townes* and *Jones.* The evidence produced at trial, however, demonstrated that Acquah did more than merely associate or fail to supervise properly.

Before we discuss the evidence of Acquah's participation in the conspiracy, we must review the law of theft as it applies to her circumstances. Appellant misstates the law of theft in her brief. She contends that even if there was sufficient evidence that the documents were stolen, the theft of the documents occurred before Acquah was involved in their use or distribution. She boldly states in her brief that when her subordinates "... got the HEO1's from their DHMH sources, the crime was complete." This is an inaccurate statement of the scope of criminal liability for theft. Theft is more broadly defined than Acquah would have us decide.

The theft statute, Md.Code Ann. art. 27, § 342(a), provides in part:

A person commits the offense of theft when he willfully or knowingly obtains control which is unauthorized or exerts control which is unauthorized over property[10] of the owner and:

(1) Has the purpose of depriving the owner of the property; or

(2) Willfully or knowingly uses, conceals, or abandons the property in such a manner as to deprive the owner of the property; or

(3) Uses, conceals, or abandons the property knowing the use, concealment, or abandonment probably will deprive the owner of the property.

---

10. At oral argument one issue addressed by counsel and considered by the panel was whether the HEO1's could amount to property subject to theft. Property is defined in Md.Code Ann. art. 27, § 340 as anything of value, including information and other intangible things of value. It is not necessary that the property's value be quantified, but it must have some value. *Jupiter v. State*, 328 Md. 635, 616 A.2d 412 (1992). The fact that the information, in the instant case, was sold by State employees is sufficient evidence that it had some tangible value.

The theft alleged in the personal record count occurred not only when the documents were transferred from the government officials to the first line of conspirators. It occurred first when the government officials exerted control over the HEO1's for the purpose of depriving the owner of the information. Each time the information was then transferred from one party to another an additional theft occurred. Each person took action to "exert unauthorized control" over property that they knew belonged to others. The State offered sufficient evidence of this theft. We additionally note that theft is a continuing crime. *See Grant v. State,* 76 Md.App. 165, 543 A.2d 897 (1988), *rev'd on other grounds,* 318 Md. 672, 569 A.2d 1237 (1990). Theft was accomplished while the HEO1's were in the CHP offices. Each person who knowingly took possession of the HEO1's, for the purpose of wrongfully depriving the owner of the information therein, committed the crime of theft and, if a party to the agreement to so deprive, joined the conspiracy.

In a search of the record for evidence that Acquah participated in the conspiracy to gain access to or obtain the information by theft, we need look no further than the testimony regarding the meetings that Acquah conducted with her staff. Testimony revealed that she instructed her staff on how to conceal the property so as to avoid detection. Others testified that she had distributed HEO1's on at least one occasion. Additionally, the State offered evidence that Acquah initially denied knowledge of the existence of HEO1's and indicated, on at least one occasion, that she would deny such knowledge if asked.

Acquah, in defense of her conduct at the meetings, contends that she consistently used the term "leads", and not HEO1's, at the sales meetings. She asserts that leads have various meanings at CHP, many of which are legitimate. Although evidence of the multiple definitions of "leads" was offered, we conclude that a rational trier of fact, given the evidence of Acquah's actions and her actions bespeaking a consciousness of guilt, could have found that she was referring

to HEO1's at the sales meetings. Her explanation was considered by the jury and apparently not believed. Evidence was produced that HEO1's were commonly referred to as "leads". The jury could have made the permissible inference that Acquah was referring to the HEO1's at the meetings. None of the other types of "leads" were illegally obtained and, therefore, not necessary to conceal. A rational trier of fact could have considered these factors, as well as Acquah's demeanor at trial, and decided to disregard her explanation. The jury is the trier of fact and is not obliged to believe the explanations or denials offered by the defendant. *Jones,* 8 Md.App. at 374, 259 A.2d 807. We conclude, therefore, that the evidence was sufficient to show that Acquah was involved in a conspiracy to further the continuing crime of theft of the personal records as prohibited by Md. State Gov't Code Ann. §§ 10–611–627.

### III.

Acquah claims that the trial judge committed reversible error by incorrectly instructing the jury concerning the law of conspiracy. Her argument is grounded on the judge's refusal to utilize the proposed jury instructions supplied by her counsel. She claims error in the instructions actually given regarding both the nature of the agreement and the level of intent required for a conspiracy conviction. The first of two refused instructions described the nature of the requisite agreement as a "unity of purpose and meeting of the minds". The second contained a requirement that the jury find "specific intent".

We note from the outset that, upon the request of either party, the judge is required to instruct the jury regarding the law. *McCallum v. State,* 81 Md.App. 403, 410, 567 A.2d 967 (1990), *aff'd,* 321 Md. 451, 583 A.2d 250 (1991). The judge is not, however, required to use the exact language offered by either party. Indeed, the trial judge possesses discretion to determine the wording and detail of each instruction. *Mills v. State,* 12 Md.App. 449, 463–64, 279 A.2d 473 (1971), *cert. denied,* 406 U.S. 967, 92 S.Ct. 2411, 32 L.Ed.2d

666 (1972). If the judge's instruction fairly covers the applicable law, we shall deem it sufficient to avoid reversal. *McCallum*, 81 Md.App. at 410, 567 A.2d 967.

Acquah's proposed instruction employed the "meeting of the minds" and "unity of purpose" language found in Maryland conspiracy cases. *E.g., Jones*, 8 Md.App. at 377, 259 A.2d 807. The fact that the language is so used, however, does not mandate its inclusion in jury instructions. "It is not always appropriate to quote from appellate decisions in jury instructions...." *State v. Grady*, 276 Md. 178, 186, 345 A.2d 436 (1975); *see also Flohr v. Coleman*, 245 Md. 254, 262, 225 A.2d 868 (1967) (reasoning that the opinions of courts are not addressed to juries and are not always appropriate for use in instructions to them). The trial judge was only obliged to instruct the jury correctly and fairly in language the veniremen could understand. *See Evans v. State*, 28 Md.App. 640, 718–19, 349 A.2d 300 (1975), *aff'd*, 278 Md. 197, 362 A.2d 629 (1976). We conclude that the trial judge adequately fulfilled this obligation.

The trial judge, regarding the nature of the agreement required to support a conspiracy conviction, instructed that:

[c]onspiracy under our law is an agreement or combination by two or more persons to accomplish criminal or unlawful acts or to do lawful acts by criminal or unlawful means

. . . .

Agreement exists if the parties to a conspiracy come to an understanding with regard to an unlawful act or purpose.

The terms "agreement" and "understanding" are commonly used terms that, for the purpose of jury instructions, are synonymous with Acquah's proposed "meeting of the minds" language. We additionally conclude the "unity of design and purpose" element was fairly met by the judge's explanation that the parties had to "come to an understanding with regard to an unlawful act or purpose".

Similarly, Acquah contends that the court's failure to instruct on specific intent was erroneous and warrants

reversal. We acknowledge that conspiracy is a specific intent crime and that such intent is an element prerequisite to a conviction. *Regle v. State,* 9 Md.App. 346, 351, 264 A.2d 119 (1970). Acquah requested an instruction identifying the degree of intent required for the crime. She asked the judge to inform the jury that "[s]pecific intent requires more than a general intent to engage in certain conduct or to do certain acts." The trial court refused to use that language in its instructions. Instead, the court instructed the jury that "the State must also prove that [Acquah] entered into the agreement or combination with the intent that the crime or crimes be committed." The judge's instruction, that the jury had to find that Acquah actually intended to agree that the underlying substantive crime be committed, fairly and adequately informed the jury of the measure of intent they must find.

▮ Finally, Acquah suggests that we should find error in the judge's use of "knowingly" and "willfully" in his theft charge without providing the jury with adequate definitions for these terms. We need not address her contention as she did not object to the instruction at trial on these grounds. Her sole objection, in this regard, was based on a lack of evidence of theft. Her argument on appeal regarding the instruction has not been preserved. *See Bowman v. State,* 337 Md. 65, 67, 650 A.2d 954 (1994).

## *IV.*

▮ A jury, consisting of eight African–Americans and four Caucasians, was chosen by counsel. After selection of the panel, Acquah raised a *Batson v. Kentucky,* 476 U.S. 79, 106 S.Ct. 1712, 90 L.Ed.2d 69 (1986) challenge because the State had exercised all of its strikes against African–Americans, who in this case represented more than two-thirds of the jurors called to the box. The trial court acknowledged a *prima facie* challenge and required the State to submit an explanation. Both parties consumed significant portions of their briefs discussing the reasons given by the State for the strikes. Initially, the State claimed the potential jurors were struck because they did not appear to want to be in the courtroom for

an estimated two week trial. The State additionally based at least some of the strikes on the verbal responses given to voir dire. When the defense pointed out that none of the venire struck by the State had responded verbally to any query, the State shifted its rationale. The State ultimately maintained that it perceived the individuals did not want to participate in the trial. The State founded its strikes, in the words of the prosecutors, on nothing "real scientific" and relied upon "body language".

Acquah does not deny that the State can rely on body language, expressions, and alertness of the jurors. She additionally fails to claim that the reasons given by the State lacked at least facial race-neutrality. Instead, she hinges her assignment of error on the State's shift to what Acquah considers its "fallback" rationale of body language and nonverbal behavior. Essentially, Acquah believes that the State's need to shift to a second set of reasons for the strikes indicates both that the State's first attempted explanation was fabricated and that the strikes were actually race-based.

Numerous opinions of this State's appellate courts have confronted *Batson* and the peremptory challenge. *E.g., Harley v. State,* 341 Md. 395, 671 A.2d 15 (1996) (*per curiam*); *Ball v. Martin,* 108 Md.App. 435, 449, 672 A.2d 143 (1996). After nearly a decade of expansion and contraction of the peremptory strike debate under *Batson,* the required analysis when strikes are challenged has reached a tenuous equilibrium. Under the process originally set forth in *Batson,* and ultimately adopted in *Gilchrist v. State,* 340 Md. 606, 667 A.2d 876 (1995) and explained in *Ball,* 108 Md.App. at 449–56, 672 A.2d 143, our trial courts, when assessing claims of improper discriminatory peremptory strikes, must complete three steps. First, the complaining party has the initial burden of showing *prima facie* impropriety based upon the other party's exercise of its peremptory strikes on an impermissible discriminatory basis. Second, once the trial court determines that the *prima facie* burden has been met, the burden shifts to the striking party to rebut the *prima facie* case by offering *any* race

neutral explanation. This proffer need not be persuasive or even plausible. Unless the striking party's explanation is inherently discriminatory, the assigned burden is overcome. *Purkett v. Elem,* 514 U.S. 765, ——, 115 S.Ct. 1769, 1771, 131 L.Ed.2d 834 (1995); *Hernandez v. New York,* 500 U.S. 352, 111 S.Ct. 1859, 114 L.Ed.2d 395 (1991); *Ball,* 108 Md.App. at 453, 672 A.2d 143. Finally, the trial court must determine whether the non-striking party has carried his burden of proving purposeful discrimination. *Gilchrist,* 340 Md. at 625, 667 A.2d 876; *Ball, supra.*

 If the trial court finds the prosecutor's explanation credible, there is little left to review. Simply put, if the trial court believes the prosecutor's non-racial justification for the strikes, and that finding is not clearly erroneous, that is the end of the matter. *Ball,* 108 Md.App. at 456, 672 A.2d 143. As we have clearly stated before:

> In a practical sense, if, after the party opposing the strike has presented a *prima facie* showing, the proponent thereof proffers a facially neutral reason *that is accepted by the trial court,* then an appeal on *Batson* principles has little, if any, chance of success, given the credibility of the proponent offering the reasons is, as it is generally, for the trial court—and not an appellate court—to determine.

*Id.* (emphasis in original).

In the instant case, there is no dispute that Acquah raised a *prima facie* challenge. Nor does Acquah contend that the explanation offered by the State was inherently discriminatory. Acquah, therefore, only questions the credibility of the prosecutors' explanation. Although we may question the motive of the State's strikes and its need for a fallback position, the deference that is now due a trial court's *Batson* findings controls the nature of appellate review when the reasons given are facially neutral. *Ball,* 108 Md.App. at 449, 672 A.2d 143.

 We find sufficient evidence in the record to decide that the judge was not clearly erroneous in believing the prosecutors' explanations. The prosecutors initially explained that they had watched the prospective jurors' responses and

reactions throughout the jury selection process. The State claims that it sought to eliminate those jurors exhibiting a poor attitude towards the possibility of participating in a two week trial. The State purportedly struck a juror who was napping and another who may have been similarly unconscious behind a pair of sunglasses. Other jurors were struck for hostility and mouthing expletives when called to the jury box. In this case, the trial judge did not accept the reasons given by the State for its strikes without first considering their merit. The judge questioned the prosecutors about the strikes and acknowledged that he had noticed some of the same traits cited by the State. We cannot conclude that the trial judge was clearly erroneous and, therefore, we will not reverse on *Batson* grounds.

## *V.*

In her final effort to reverse her conviction, Acquah contends that the judge below, by word and deed, made it evident to the jury that he wanted the defendant convicted. She asserts that the trial judge took numerous partisan actions to further the State's case and, thereby, denied Acquah a fair trial. Essentially, Acquah charges the judge with improper conduct. In support of this final argument, Acquah specifies seven instances of alleged misconduct by the trial judge. Acquah alleges that the trial judge

1) *sua sponte* challenged defense strikes on *Batson* grounds;

2) interrupted defense counsel's opening statement and called defense counsel to the bench for arguing during the opening;

3) began questioning a witness in front of the jury;

4) on numerous occasions, cause reiteration of evidence favorable to the State in front of the jury, claiming an inability to hear;

5) interrupted defense counsel's cross-examination of a co-conspirator after, on the previous day, objecting to defense

counsel's cross-examination and encouraging the State to object;

6) wrongly allowed testimony elicited by the State into evidence while refusing to accept certain testimony supporting the defense; and

7) refused to instruct the jury regarding the law of conspiracy employing the language proposed by defense counsel.

We first note that Acquah, in her final argument, does not suggest that we assign error for any of the above seven categories individually. She asserts that these incidents, considered in the aggregate, are compelling evidence of judicial bias. We need not reach such a determination as Acquah has not preserved this issue for appeal. Acquah did not, at any time during the trial that she has pointed us to or that we could find in our review, contend that the judge was embarking on a course of improper conduct that either warranted recusal or a mistrial. Neither did she seek any particular relief from the trial judge with respect to this alleged pattern of conduct. As we have previously required,

> [W]e recognize that counsel is in a precarious position when he or she believes that the trial judge, by his actions, has caused harm to his or her client's case. The dilemma is he or she must choose between, on the one hand, remaining mute and not protecting a client's interest or, on the other hand, incurring the wrath of a trial judge in an effort to preserve a record on which the lower court's actions may be reviewed. Nevertheless, it is incumbent upon counsel to state with clarity the specific objection to the conduct of the proceedings and make known the relief sought.

*Braxton v. Faber,* 91 Md.App. 391, 407, 604 A.2d 543 (1992).[11]

Acquah chose to assign error, not to the propriety of the trial judge's actions, but to the "pervasive assistant prose-

---

11. We note that this Court held, in *Suggs v. State,* 87 Md.App. 250, 257–58, 589 A.2d 551 (1991), that counsel had not waived the right to appeal his conviction on the grounds of judicial misconduct by failing to object. In that case, however, we concluded that counsel for the appellant rightfully feared that he would "incur the great wrath of the

cutor role played by the learned trial judge below". In order to preserve this issue for appeal, Acquah must first have objected to the individual instances of improper conduct. *See McMillian v. State*, 65 Md.App. 21, 26, 499 A.2d 192 (1985) (holding that appellant waived review by failing to object at trial to ten of twelve alleged instances of misconduct). Acquah did not interpose an objection with respect to at least two of her alleged seven instances of misconduct, i.e. the judge's questioning of witnesses and reiteration of evidence favorable to the State. A third instance, the allegedly improper jury instruction regarding conspiracy, was raised in this appeal and decided not to be error. This leaves Acquah with, at most, four instances of misconduct upon which her allegations must rest.

 We will not address these four individually. Although Acquah objected to each incident, she failed to object to the "pattern of improper conduct". It is the "pattern" of the judge's conduct that she asks us to review, not the propriety of the individual instances. It is, therefore, to this "pattern" that she was required to object at trial. In order to gain review of the conduct and actions of a trial judge, the aggrieved party must (1) raise the issue during trial, (2) make a record with facts set forth in reasonable detail to show the purported bias of the court, (3) factual assertions supporting the claim must be made in the presence of the judge and opposing counsel, (4) the party must not be ambivalent in setting forth his or her position regarding the judge's actions, and (5) the specific relief sought must be stated with particularity. *Braxton*, 91 Md.App. at 409, 604 A.2d 543; *see Surratt v. Prince George's County*, 320 Md. 439, 467 n. 9, 578 A.2d 745

---

already outraged trial judge". *Id.* at 258, 589 A.2d 551; *see Hosain v. Malik*, 108 Md.App. 284, 297, 671 A.2d 988 (1996). We can find no hint of outrage on the part of the trial judge in the instant case. We did note several instances of what, in context and language, appeared to be good natured sparring between the judge and defense counsel, who, incidentally, were former judicial colleagues. Defense counsel should hardly perceive error in such exchanges in which he not only participated but occasionally, not surprisingly, instigated.

(1990) (discussing the procedures for requesting recusal of a biased judge and the motivation for such procedures). Acquah fails to clear even the first hurdle because she did not properly raise the issue of improper conduct at trial and give the judge an opportunity to act accordingly. We shall not, therefore, conduct any further analysis of the propriety of the trial judge's actions.

We conclude that Acquah's conviction, although adroitly contested at trial and before our Court, shall stand affirmed.

JUDGEMENT AFFIRMED; COSTS TO BE PAID BY APPELLANT.