6 A.3d 381

**James Edward BREAKFIELD**

v.

**STATE of Maryland.**

**No. 617, Sept. Term, 2009.**

Court of Special Appeals of Maryland.

Oct. 4, 2010.

Mark Colvin (Paul B. DeWolfe, Public Defender, on the brief) Baltimore, MD, for appellant.

Ryan R. Dietrich (Douglas F. Gansler, Atty. Gen., on the brief) Baltimore, MD, for appellee.

Panel: ZARNOCH, MATRICCIANI and RAYMOND G. THIEME, JR. (Retired, Specially Assigned), JJ.

MATRICCIANI, J.

On February 2, 2009, James Edward Breakfield, appellant, was convicted by a jury in the Circuit Court for Baltimore City of misappropriation by a fiduciary and felony theft. On the misappropriation count, the court sentenced appellant to one year of imprisonment. On the felony theft count, the trial judge sentenced appellant to three years, suspended all but one year, to be served concurrently with the sentence imposed for the misappropriation conviction. In addition, the court ordered appellant to serve three years probation, beginning with his release from incarceration, and to pay restitution of $14,000.00 to the Criminal Injuries Compensation Fund. Appellant filed a timely appeal, raising the following questions, which we quote:

1. Did the trial court err in excluding the testimony of three defense witnesses?

2. Is the evidence insufficient to sustain the convictions?

3. Are separate sentences for felony theft and misappropriation by a fiduciary improper?

4. Did the trial court err in ordering Mr. Breakfield to pay restitution of $14,000.00 to the Criminal Injuries Compensation Board (CICB)?

For the reasons set forth below, the judgments shall be affirmed, but we direct the circuit court to merge the prison sentences, vacate the restitution order, and remand for a reconsideration of the restitution issue.

## Facts and Proceedings

Appellant was co-owner and manager of C & J Peaceful Assisted Living Home, Inc. ("C & J"), which had two locations in Baltimore City. Nellie Jackson was a 78 year-old resident at the C & J facility located at 1011 Reverdy Road, where she stayed for a total of 15 days in the summer of 2006. Appellant's trial was conducted from January 29 until February 2, 2009, and concerned two counts: first, fraudulent misappropriation of Ms. Jackson's money that he held in a fiduciary capacity, in violation of Md.Code (2002, 2006 Repl.Vol.), § 7–

113(a)(1) of the Criminal Law Article ("CL"), and, second, felony theft, in violation of CL § 7–104. The criminal acts were alleged to have taken place between June 22, 2006, and August 2, 2006. The State's first witness at trial was Sharon Smith, assistant business manager at HCR Manor Care–Dulaney in Towson ("Manor Care"), who testified that Ms. Jackson resided at Manor Care for 41 days in May and June of 2006. On June 22, 2006, Ms. Jackson was discharged from Manor Care to C & J, and Manor Care issued her two checks, representing the balance of her funds held on account. The first check, dated June 22, 2006, was for $25,000.00, and the second check, dated June 23, 2006, was for $2,404.49. Each check was payable to the order of "Nellie Jackson, c/o C & J Peaceful Asst. Liv. Home." Ms. Jackson returned to Manor Care in late November 2006, where she stayed until March 2007, when she was discharged to Maryland General Hospital. Ms. Jackson died in 2008.

Gina Jennings, the Director of Nursing at Manor Care, testified that Ms. Jackson was an elderly, frail woman who spent most of the time in her room, doing things like crossword puzzles and writing letters. She neither harmed anyone nor was at risk for wandering or leaving the building. Manor Care provided additional one-on-one care only if a resident was a risk to herself or to others and only if such care was ordered by a physician. If a resident desired one-on-one care but it was not medically ordered, Manor Care would provide it through an outside agency, at the resident's expense.

Ms. Jennings testified that the only change in Ms. Jackson's condition between her first and second stay at Manor Care was that "she came back with more cardiac medications" due to a heart attack between the two stays, but there was no change in her psychological profile.

Taressa Crest is a health facility nurse surveyor with the Assisted Living Unit of The Maryland Department of Health and Mental Hygiene. She testified that she inspected both of C & J's locations in 2006. She did not recall the exact dates or whether Ms. Jackson was present at the time of her

inspections. Ms. Crest found both facilities to be "in compliance," meaning "they fulfilled the minimum requirements under the COMAR regulations."

Ms. Crest explained that a resident agreement, required by regulation, is a contract between an assisted living facility and its resident that lists the services to be provided and the fees. There are three levels of care in an assisted living facility, with level three being the maximum care. If a resident wants extra services not included in the resident agreement, an addendum to the resident agreement is required. The purpose for requiring this written addendum is "to prevent misuse of resident funds." Additional fees may be charged to the resident as long as they are documented in the addendum. If a resident wants one-on-one care, the facility must first have a healthcare practitioner assessment form completed by a physician.

Ms. Crest further testified that a resident's funds are handled by either the resident, the resident's agent, or the assisted living facility. If the funds are handled by the facility, written authorization by the resident is required and the facility must keep the funds in an interest-bearing account, separate from the facility's funds, and keep accurate records of how the resident's funds are spent. A "representative payee is someone who is authorized to manage the account of the resident." Ms. Crest was not sure whether appellant was an authorized payee of Ms. Jackson.

The State's final witness was Yvette Finney, from the Attorney General's Office, Medicaid Fraud Control Unit. She had interviewed Ms. Jackson, employees of assisted living facilities in which Ms. Jackson resided, and she had subpoenaed bank and medical records from the facilities in which Ms. Jackson resided in 2006.

Ms. Jackson signed a resident agreement with C & J on June 16, 2006, which provided that she would pay $3,500.00 per month for level three services, plus a $600.00 security deposit. There was no reference to 24–hour one-on-one care

in the resident agreement. When Ms. Jackson first arrived at C & J on June 22, 2006, she had $27,404.49 in her account.

Ms. Finney testified that on a C & J initial nursing assessment, signed by Dionne Hudgins, RN on June 27, 2006, it was stated that Ms. Jackson had no difficulty sleeping but she was incapable of administering medications to herself. The preprinted portion of the form included the following:

Resident's Medical Status Criteria:

1. The resident's health care needs are Chronic, Stable, Uncomplicated, Routine.

2. The Environment is Conducive to the Delegation of Nursing Tasks.

3. The Resident is Unable to Perform All of His/Her Own Care.

4. The Resident is in Need of 24–hour Supervision And/or Assistance.

Initially, Ms. Jackson remained at C & J for five days, from June 22 until June 27, 2006, and then was admitted into Good Samaritan Hospital for arthritic pain. She remained at Good Samaritan through June 29, and on June 30, Ms. Jackson was transferred to University of Maryland Hospital for inpatient psychiatric services. Ms. Jackson returned to C & J on July 5, 2006, where she remained until July 14, 2006, after which she was returned to the University of Maryland Hospital for respiratory problems. Ms. Jackson was then admitted to Belle Vista, another assisted living facility, on July 31, 2006. The total time Ms. Jackson spent at C & J was fifteen days.

Ms. Finney testified regarding documents produced by appellant pursuant to a grand jury subpoena which was served on April 16, 2007. None of the records mentioned 24 hour one-on-one care being provided for her. State's Exhibit 10 was a check written from C & J Assisted Living Facility, signed by appellant, payable to Belle Vista Assisted Living Facility, LLC, dated July 31, 2006, which, in the memo column, says "file account closed." Ms. Finney testified that the M & T

Bank Statement for C & J showed that on June 26, 2006, there was a deposit of $25,000 made into the account.

State's Exhibit 7A was a document dated May 14, 2007, produced by appellant in response to a grand jury subpoena. The document states in relevant part as follows:

Ref:  Fees for contract services regarding Nellie Jackson

1. Sitter service/in room 24/7 flat fee .....$14,000.00
2. Room and Board fee ................. 3,500.00
3. Security Deposit ....................... 600.00
4. Miscellaneous items.................... 400.00
5. Total.............................$18,500.00

Note: $10,000.00 Transferred with client to new place of resident.  (See in file)

At the conclusion of the State's case, defense counsel moved for judgment of acquittal on the ground that the State had failed to prove that appellant acted with an intent to permanently deprive Ms. Jackson of her money or that he fraudulently and wilfully misappropriated her money.  The motion was denied.

The State then moved to exclude the testimony of three defense witnesses based on Maryland Rule 4–263, because the State had just learned their names during voir dire the day before.  After a hearing, which lasted more than an hour, the trial judge granted the State's motion.

Appellant testified in his own defense.  He first met Ms. Jackson at Manor Care, and described her as "70–ish", frail, and able to carry on a conversation and to discuss her personal business.  She signed a C & J resident agreement, which called for her to pay $3,500 per month for a semi-private room.  Appellant testified that he gave her a private room for an additional $500 per month, although he normally charged $7,000 per month for a private room.

According to appellant, he interpreted the line in the C & J initial nursing assessment that states "resident is in need of 24–hour supervision and/or assistance," to mean that Ms. Jackson was in need of 24–hour personal care service around the clock.  He testified that such service required assisting

with medications, changing soiled bed sheets, providing special dietary food, toilet-training assistance, health and safety concerns, and staying with Ms. Jackson 24/7 when providing such services. The cost for these services was $22 per hour. However, he testified that it was "a mistake, an administrative oversight" for him not to place the additional charges into a written addendum.

Appellant took the two checks made payable to Ms. Jackson and placed them in a business account "to establish a payee account and transfer the money to the account when such time the account has been established, usually 30 to 60 days." During that time, Ms. Jackson requested not to return to the facility. Therefore, appellant explained that the funds for C & J's services were deducted, and the balance of $10,000 was passed on to the new facility. He further explained that there was generally a 30-day delay to establish a payee account properly, but because C & J was already in the system, he simply deposited the two checks into that account.

Appellant testified that Ms. Jackson was in his facility for a total of eighteen days. However, he charged her $8,000 for two months because he needed to maintain her residence while she was in the hospital. Appellant could not explain why the resident agreement stated $3,500 per month, and why there was no addendum showing any higher charge for a private room. According to appellant, the 18 days Ms. Jackson stayed with C & J equaled 432 hours, so the sitter services at $22 per hour cost an additional $9,504. There was a $600 security fee, and a $400 miscellaneous fee, which included a charge for sending flowers from C & J to Ms. Jackson when she was at the hospital. The $10,000 check he wrote to the next place of residence brought the total to $28,500, which he pointed out was more money than she had when she first entered C & J.

Appellant testified that he personally provided all extra one-on-one services for Ms. Jackson, although he had general staff assist with female toiletry activities. Appellant testified that he was there around the clock when Ms. Jackson was there,

despite the fact that he was listed as assisted-living manager at the other C & J assisted living facility on Lucia Avenue. According to appellant, C & J had no clients at the other facility at that time.

After closing arguments, the jury deliberated and convicted appellant of both charges. On April 14, 2009, the court sentenced appellant to one year of imprisonment and ordered him to pay $14,000 to the CICB. On May 4, 2009, the appellant filed his appeal to this court. On that same date, the appellant filed a motion for modification of sentence, which the court denied on May 7, 2009.

## DISCUSSION

### 1. *Trial court's exclusion of three defense witnesses*

Appellant's first argument is that the trial court committed reversible error by excluding the testimony of three defense witnesses. He argues that the ruling was based on defense counsel's unfamiliarity with Maryland Rule 4–363's new [1] disclosure requirement. The excluded witnesses were two character witnesses and one fact witness. Appellant argues that the State had sufficient time to investigate their background prior to their testimony, given that the prosecutor was provided with their names on the first day of a three-day trial.

The State maintains that the trial court properly exercised its discretion when it excluded these witnesses due to a failure to abide by the rules governing discovery in criminal cases, and that "the exclusion of the witnesses was an appropriate remedy given the severity of the violations committed by defense counsel."

On April 8, 2008, the Court of Appeals adopted a new version of Maryland Rule 4–263, which currently provides, in relevant part, as follows:

**Rule 4–263. Discovery in circuit court**

\* \* \*

---

1. The Rule was amended effective July 1, 2010.

(e) **Disclosure by Defense.** Without the necessity of a request, the defense shall provide to the State's Attorney:

(1) Defense Witness. The name and, except when the witness declines permission, the address of each defense witness other than the defendant, together with all written statements of each such witness that relate to the subject matter of the testimony of that witness. Disclosure of the identity and statements of a person who will be called for the sole purpose of impeaching a State's witness is not required until after the State's witness has testified at trial.

\* \* \*

(3) Character Witnesses. As to each defense witness the defense intends to call to testify as to the defendant's veracity or other relevant character trait, the name and, except when the witness declines permission, the address of that witness;

(4) Alibi Witnesses. If the State's Attorney has designated the time, place and date of the alleged offense, the name and, except when the witness declines permission, the address of each person other than the defendant whom the defense intends to call as a witness to show that the defendant was not present at the time, place, or date designated by the State's Attorney[.]

\* \* \*

(h) **Time for Discovery.** Unless the court orders otherwise:

\* \* \*

(2) the defense shall make disclosure pursuant to section (e) of this Rule no later than 30 days before the first scheduled trial date.

\* \* \*

(j) **Continuing Duty to Disclose.** Each party is under a continuing obligation to produce discoverable material and information to the other side. A party who has responded to a request or order for discovery and who obtains further

material information shall supplement the response prompt-
ly.

(k) **Manner of Providing Discovery; Material Not to
be Filed with Court.**

\*      \*      \*

(3) Not to be Filed with the Court.  Except as otherwise
provided in these Rules or by order of court, discovery
material shall not be filed with the court.  This section does
not preclude the use of discovery material at trial or as an
exhibit to support or oppose a motion.

\*      \*      \*

(n) **Sanctions.** If at any time during the proceedings the
court finds that a party has failed to comply with this Rule
or an order issued pursuant to this Rule, the court may
order that party to permit the discovery of the matters not
previously disclosed, strike the testimony to which the un-
disclosed matter relates, grant a reasonable continuance,
prohibit the party from introducing in evidence the matter
not disclosed, grant a mistrial, or enter any other order
appropriate under the circumstances.  The failure of a party
to comply with a discovery obligation in this Rule does not
automatically disqualify a witness from testifying.  If a
motion is filed to disqualify the witness's testimony, disqual-
ification is within the discretion of the court.

After appellant's motion for judgment of acquittal was de-
nied and he advised the court of his desire to testify, the
prosecutor moved to exclude the three defense witnesses,
whose names she had learned the previous day.  Defense
counsel's response was as follows:

I thought we had supplied the witnesses.  This is the first
time I've heard that counsel didn't have it, but I think she's
had them now for two days to in fact have time to question
them. . . .

Judge, I thought the State was in possession of them.  I
thought—I can't say when they were sent, but I talked to
the State on several occasions and I never thought that they
did not have them.

Throughout the hearing, appellant's counsel maintained that he mistakenly believed that the State already had the witnesses' names.

On appeal, however, appellant raises a different reason: he argues that defense counsel was unfamiliar with the new version of Maryland Rule 4–263 and the fact that it required both State and defense counsel to provide all witness names within 30 days of trial. Simply put, this argument was never raised by defense counsel during trial, and, for that reason, Maryland Rule 8–131(a) precludes it from being raised for the first time on appeal. "[U]nless a defendant makes timely objections in the lower court or makes his feelings known to that court, he will be considered to have waived them and he cannot now raise such objections on appeal." *Caviness v. State,* 244 Md. 575, 578, 224 A.2d 417 (1966); *accord. Halloran v. Montgomery County Dep't of Public Works,* 185 Md.App. 171, 202, 968 A.2d 1104 (2009). This Court has repeatedly stated that we will not decide an issue unless it plainly appears to have been decided below. *Sutton v. State,* 139 Md.App. 412, 424, 776 A.2d 47 (2001); *Acquah v. State,* 113 Md.App. 29, 43, 686 A.2d 690 (1996) (Maryland Rule 8–131 requires party to raise issue before trial court to preserve it for appeal).

Even if appellant were to have preserved this issue properly by raising it before the trial judge, we cannot say that the judge committed error by granting the State's motion to exclude the witnesses. In the case before us, the State was not provided with the names of any defense witnesses prior to trial. The first time any name was provided was during *voir dire,* when defense counsel provided the names of Mary Moses, a witness who had allegedly performed 24–hour personal care services for Ms. Jackson, and two character witnesses, Charles Cremartie and Ernest Widener. The trial had been rescheduled at least twice since the new rules came into effect, and defense counsel had ample opportunity to provide the names of character witnesses prior to trial.

Although it is true that Rule 4–263(n) does not automatically require exclusion of evidence for a violation of discovery, the Rule states that the trial court has discretion to decide what sanction is appropriate under the circumstances. In *Thomas v. State*, 397 Md. 557, 570–71, 919 A.2d 49 (2007), the Court of Appeals held that in exercising its discretion regarding sanctions, "a trial court should consider: (1) the reasons why the disclosure was not made; (2) the existence and amount of any prejudice to the opposing party; (3) the feasibility of curing any prejudice with a continuance; and (4) any other relevant circumstances." The Court further noted that exclusion of evidence is not a favored sanction, and should be ordered only in extreme cases. *Id.* at 572–73, 919 A.2d 49.

In the case before us, the trial court's exclusion of Mary Moses as a fact witness was reasonable, because her name had never been disclosed on any subpoenaed document provided by appellant regarding employees or contractors of C & J. As to the remaining two character witnesses, appellant argues that they should have been permitted to testify because defense counsel's failure to disclose them prior to trial was not willful, but rather, the result of counsel's mistaken belief that disclosure of non-alibi witnesses was not required. As noted at trial, he raised a different reason for non-disclosure—he thought he had already advised the State.

The trial court was not erroneous in this case by utilizing the powers set forth in Rule 4–263. *Simons v. State*, 159 Md.App. 562, 576, 860 A.2d 416 (2004) (if there is a violation of discovery rule requiring disclosure of pre-trial identifications, remedy is generally within sound discretion of trial court); *see also Middleton v. State*, 49 Md.App. 286, 431 A.2d 734 (1981) (in prosecution for robbery, no abuse of discretion in refusal to permit alibi witness to testify where notice of alibi given on first day of trial);. Although preventing all witnesses from testifying was a harsh sanction for violation of the discovery rules, Rule 4–263 makes plain that defendants may not wait until trial to disclose their evidence, and if they do, the trial court has authority to exclude such evidence from the case.

### 2. *Sufficiency of the evidence.*

In deciding a claim relating to the sufficiency of the evidence, the appropriate inquiry is "whether, after viewing the evidence in the light most favorable to the prosecution, any rational trier of fact could have found the essential elements of the crime beyond a reasonable doubt." *Jackson v. Virginia,* 443 U.S. 307, 319, 99 S.Ct. 2781, 61 L.Ed.2d 560 (1979); *accord, State v. Smith,* 374 Md. 527, 533, 823 A.2d 664 (2003). In making this review, *"all of the evidence* is to be considered in the light most favorable to the prosecution." *Jackson,* 443 U.S. at 319, 99 S.Ct. 2781 (footnote omitted) (emphasis in original); *accord. Bible v. State,* 411 Md. 138, 156, 982 A.2d 348 (2009); *Moye v. State,* 369 Md. 2, 12, 796 A.2d 821 (2002). This rule applies to both direct and circumstantial evidence. *State v. Albrecht,* 336 Md. 475, 478–79, 649 A.2d 336 (1994).

"We give 'due regard to the [fact finder's] findings of fact, its resolution of conflicting evidence, and, significantly, its opportunity to observe and assess the credibility of witnesses.' " *Harrison v. State,* 382 Md. 477, 487–8, 855 A.2d 1220 (2004) (citations omitted). Moreover, an appellate court does "not measure the weight of the evidence; rather we concern ourselves only with whether the verdict was supported with sufficient evidence, direct or circumstantial, which could fairly convince a trier of fact of the defendant's guilt of the offenses charged beyond a reasonable doubt." *McDonald v. State,* 347 Md. 452, 474, 701 A.2d 675 (1977); *accord Pinkney v. State,* 151 Md.App. 311, 329, 827 A.2d 124 (2003).

As the Court of Appeals reiterated in *Bible,* the appellate court "must give deference to all reasonable inferences [that] the fact-finder draws, regardless of whether [the appellate court] would have chosen a different reasonable inference." 411 Md. at 156, 982 A.2d 348 (quoting *State v. Suddith,* 379 Md. 425, 430, 842 A.2d 716 (2004)); *accord Fraidin v. State,* 85 Md.App. 231, 241, 583 A.2d 1065 (1991) (limited question before the reviewing court "is not whether the evidence *should have* or *probably would have* persuaded the

majority of fact finders but only whether it *possibly could have* persuaded *any* rational fact finder.") (Emphasis in original).

Finally, it is well settled that a defendant's intent may be inferred from the circumstances surrounding his acts. *Graham v. State*, 117 Md.App. 280, 284, 699 A.2d 1204 (1997). As we have stated:

> In determining the intent of the defendant, the trier of fact is permitted to infer the requisite intent from the surrounding circumstances. Intent is subjective, such that, without the cooperation of the accused, it cannot be directly and objectively proven. Consequently, without a statement from the accused, its presence must be shown by established facts that permit a proper inference of its existence.

*Id.; see also Ashton v. State*, 185 Md.App. 607, 615, 971 A.2d 965 (2009) (because intent to steal is subjective, it may be inferred from a totality of the circumstances).

Appellant was convicted of two offenses. The first, CL § 7–104 for felony theft, provides in relevant part that "[a] person may not willfully or knowingly obtain or exert unauthorized control over property, if the person . . . intends to deprive the owner of the property." The second offense, CL § 7–113 for misappropriation by a fiduciary, provides in relevant part that "[a] fiduciary may not . . . fraudulently and willfully appropriate money . . . that the fiduciary holds in a fiduciary capacity contrary to the requirements of the fiduciary's trust responsibility."

Appellant contends that the State failed to show beyond a reasonable doubt that appellant possessed the necessary intent to deprive Ms. Jackson of her money permanently, as is required by § 7–104(a)(1), or that he acted willfully and with the specific intent to commit fraud, as required by § 7–113(a)(1). Rather, appellant posits that the evidence shows, at most, that he failed to comply with COMAR regulations regarding record-keeping. *See Schwartz v. State*, 103 Md. App. 378, 386, 653 A.2d 958 (1995) (conviction by judge for fiduciary misappropriation and theft reversed where appellee

failed to show that the defendant had the requisite intent to support the convictions).

■ The evidence before the jury was sufficient for the jury to find that appellant acted with the requisite intent to deprive Ms. Jackson of her funds, and thus to convict him of each offense. *See, e.g., White v. State,* 100 Md.App. 1, 19–20, 639 A.2d 194 (1994) (intent necessary to prove theft and fraudulent misappropriation need not be proven directly but "may be shown by [the] surrounding circumstances").

When Ms. Jackson entered C & J, appellant took control of her funds totaling $27,404.36, and, rather than placing the money into a separate account, he deposited them directly into C & J's account. In addition, the jury was presented with evidence that, after Ms. Jackson signed a resident agreement which stated that monthly fees would total $3,500.00 for level-three care, and she spent a total of just 15 days at C & J, Ms. Jackson was charged $17,404.36 for her time at appellant's facility.

The evidence showed that "level three" care was the highest level of individual care at an assisted living facility, and that there was no indication that Ms. Jackson required anything more; nor were there any doctor's orders for her to receive 24–hour, around-the-clock sitter care. Indeed, such care could only be given if a physician's assessment were issued, and there was none in her record.

However, appellant argued that she was receiving 24–hour around-the-clock sitter care, at $22 per hour. Although Ms. Jackson was documented as a sound sleeper, appellant was being paid $22 per hour for each night that she spent at C & J. The jury apparently did not believe that she either required or ordered such care, assuming it had actually been provided.

Appellant testified that Ms. Jackson's monthly rate was not $3,500, but $4,000 per month because she received a private room, although no written addendum to her resident agreement was ever executed. Appellant also charged Ms. Jackson $400 in "miscellaneous fees," which was not disclosed in the resident agreement.

After reviewing all of the circumstantial evidence, the jury found appellant guilty of the two offenses. We affirm their decision because the evidence was sufficient to find appellants' criminal intent beyond a reasonable doubt.

### 3.  Separate sentences for felony theft and misappropriation by a fiduciary.

■  Appellant claims that his sentence for fraudulent misappropriation by a fiduciary should be merged into his sentence for felony theft, under the rule of lenity. The State concedes that this result is mandated by the relevant case law, such as *White*, 100 Md.App. at 8–12, 639 A.2d 194, in which we held that although separate sentences for convictions of fraudulent misappropriation by a fiduciary and felony theft do not merge under the required evidence test, the sentences do merge under the rule of lenity. *See also State v. Burroughs*, 333 Md. 614, 624–7, 636 A.2d 1009 (1994) (sentence for fraudulent misappropriation by a fiduciary should be merged into sentence for theft by deception under rule of lenity).

Accordingly, appellants' sentence for fraudulent misappropriation by a fiduciary will be vacated because that count merges with felony theft, for sentencing purposes.

### 4.  Restitution of $14,000 to Criminal Injuries Compensation Board.

■  Finally, appellant argues that the trial court erred in ordering him to pay restitution of $14,000.00 to the Criminal Injuries Compensation Board. Authorized recipients of restitution are listed in Md.Code (2001, 2005 Repl.Vol.), § 11–606(a) of the Criminal Procedure Article ("CP"), and include, among others, the victim and the Criminal Injuries Compensation Board ("CICB"). Given that Ms. Jackson, the victim, died in 2008, the trial court was unable to order appellant to make restitution directly to her.[2]

---

**2.**  The Criminal Procedure Article, § 11–601, provides:

(j) *Victim.*—"Victim" means:

Appellant contends that it was error under Maryland law for the court to order him to pay restitution to the CICB, because Ms. Jackson did not receive any payments from the CICB. The State maintains that appellant failed to raise any objection to the restitution penalty during sentencing, and, in any event, the trial court's order is legally permissible.

We held in *Chilcoat v. State*, 155 Md.App. 394, 413, n. 4, 843 A.2d 240 (2004) that "[t]he identity of a restitution payee is a substantive matter. If the trial court was not authorized to order restitution to a creditor, then the provision constituted an illegal sentence." A challenge to an illegal sentence may be made at any time. *Id.* A sentence is "illegal" if it is beyond the statutory power of the court to impose. *Id.* Thus, we must address whether the statute gives the trial court the power to order that restitution be made to the CICB where it has not paid out on behalf of the victim.

The Criminal Procedure Article, § 11–603, provides:

## § 11–603. Restitution determination

(a) *Conditions for judgment of restitution.*—A court may enter a judgment of restitution that orders a defendant or child respondent to make restitution in addition to any other penalty for the commission of a crime or delinquent act, if:

(1) as a direct result of the crime or delinquent act, property of the victim was stolen, damaged, destroyed, converted, or unlawfully obtained, or its value substantially decreased;

\*　　　\*　　　\*

(5) the Criminal Injuries Compensation Board paid benefits to a victim[.]

A plain reading of this statute shows that two of the circumstances under which a trial court may order a defendant to pay restitution are if property is stolen, converted or

---

(1) a person who suffers death, personal injury, or property damage or loss as a direct result of a crime or delinquent act; or

(2) if the person is deceased, the personal representative of the estate of the person.

unlawfully obtained as a result of the crime, *or* if the CICB pays benefits to a victim. CP § 11–603(a)(1), (a)(5). In the case before us, restitution is proper because, as a direct result of the actions of appellant, approximately $14,000 of Ms. Jackson's money was stolen, converted or unlawfully obtained by appellant.

The question is whether CICB was a proper recipient of restitution here, when it never made any payments to the victim. Criminal Procedure section 11–606 addresses restitution recipients and states, in pertinent part:

### § 11–606. Payment of restitution

(a) *Restitution recipients.*—The court may order that restitution be paid to:

(1) the victim;

(2) the Department of Health and Mental Hygiene, the Criminal Injuries Compensation Board, or any other governmental unit;

(3) a third-party payor, including:

(i) an insurer; or

(ii) any other person that has, under Part I of this subtitle:

1. compensated the victim for a property or pecuniary loss; or

2. paid an expense on behalf of a victim;

(4) any person for whom restitution is authorized by law; or

(5) a person who has provided to or for a victim goods, property, or services for which restitution is authorized under § 11–603 of this subtitle.

(b) Priority of restitution payments.—(1) Subject to paragraph (2) of this subsection, payment of restitution to the victim has priority over payment of restitution to any other person or governmental unit.

(2) If the victim has been fully compensated for the victim's loss by a third-party payor, the court may issue a

judgment of restitution that directs the restitution obligor to pay restitution to the third-party payor.

When the words of a statute are clear and unambiguous, according to their commonly understood meaning, our inquiry ordinarily ends. *Fister v. Allstate Life Ins. Co.*, 366 Md. 201, 212, 783 A.2d 194 (2001). A statute should be read as a whole to ensure that none of its provisions are rendered meaningless and should not be construed to reach a result that is unreasonable, illogical, or inconsistent with common sense. *Briggs v. State*, 413 Md. 265, 274–5, 992 A.2d 433 (2010). The language in CP § 11–606(a) is silent as to whether "the Department of Health and Mental Hygiene, the Criminal Injuries Compensation Board, or any other governmental unit" had to have paid the victim before they can be compensated. Thus, we must look beyond the statutory language to the statute's legislative history, prior case law, the statutory purpose, and the statutory structure as aids in ascertaining the Legislature's intent. *Id.* at 275, 992 A.2d 433.

As indicated, the issue before us is whether the "court may order that restitution be paid to ... the Criminal Injuries Compensation Board" where the CICB has not paid any benefits to the victim. After considering the purpose and format of the statute, we hold that the court erred by ordering that restitution be paid to the CICB.

In *Pete v. State*, 384 Md. 47, 55, 862 A.2d 419 (2004), the Court of Appeals explained:

Restitution under Maryland's Criminal Procedure Article is a criminal sanction, not a civil remedy. It serves at least three distinct purposes. First, it is a form of punishment for criminal conduct. Second, it is intended to rehabilitate the defendant. Lastly, it affords the aggrieved victim recompense for monetary loss.

(Internal citations and quotation marks omitted). *See also In re Don Mc*, 344 Md. 194, 203, 686 A.2d 269 (1996) (fundamental objective of restitution is the rehabilitation of the defendant); *Anne Arundel County v. Hartford Accident and Indem. Co.*, 329 Md. 677, 685, 621 A.2d 427 (1993) ("The fun-

damental purpose of ordering restitution as a condition of probation is rehabilitating the defendant and affording the aggrieved victim recompense for monetary loss.").

The Court held in *Pete* that an order of restitution establishes "at most, two things: (1) that the defendant was guilty of a crime; and (2) that, as a direct result of that crime, the persons or entities to whom the restitution is ultimately payable suffered losses (i) of a kind enumerated in the statute and (ii) at least in the amount stated in the restitution order." 384 Md. at 59, 862 A.2d 419.

Here, the order of restitution did not and could not establish that the entity to whom the restitution is ultimately payable, the CICB, suffered losses of a kind enumerated in the statute. That is because the CICB provides compensation only to those persons who "suffer . . . physical injury or death as a result of a crime or delinquent act." CP § 11–808(a)(1).[3] Nor does the record indicate that the CICB paid any benefits to Ms. Jackson.

We have traditionally focused on the General Assembly's inclusion of the words "direct result" when reviewing the legislative history of CP § 11–603(a). *Williams v. State*, 385 Md. 50, 867 A.2d 305 (2005) (theft victim, who was unable to recover his motorcycles due to a failure to produce proof of ownership, was not entitled to restitution despite the undeniable causal link between the theft and the motorcycles ending up in the city impoundment, because the nexus did not partake of directness required by the statute); *see also Pete*, 384 Md. at 66, 862 A.2d 419 (holding that restitution to the Local Government Insurance Trust for damages to a patrol car that occurred when defendant fled police was not a proper condition of probation for the second degree assault conviction

---

**3.** Although the statute also provides for compensation in some circumstances where the victim has suffered psychological injury, those provisions are clearly not applicable to this case. The victim here was an elderly woman who was taken advantage of by her nursing provider because of mental frailty and suffered economic, rather than physical or psychological, injury.

because the damages to the patrol car did not arise as a direct result of the second degree assault);.

In *Chaney v. State,* 397 Md. 460, 470, 918 A.2d 506 (2007), the Court of Appeals held:

> An order of restitution entered in a criminal case, even when attached as a condition of probation, is a criminal sanction—part of the punishment for the crime. Although it has a therapeutic and rehabilitative function with respect to the defendant, its predominant and traditional purpose is to reimburse the victim for certain kinds of expenses that he or she incurred as a direct result of the defendant's criminal activity. It is not a judicially imposed gift to the victim, but reimbursement that the defendant, personally, must pay.
>
> Because restitution is part of a criminal sentence, as a matter of both constitutional due process and Maryland criminal procedure, such an order may not be entered unless (1) the defendant is given reasonable notice that restitution is being sought and the amount that is being requested, (2) the defendant is given a fair opportunity to defend against the request, and (3) there is sufficient admissible evidence to support the request—evidence of the amount of a loss or expense incurred for which restitution is allowed and evidence that such loss or expense was a direct result of the defendant's criminal behavior.

(Internal citations omitted.)

The Court ultimately vacated the restitution order in *Chaney* because it had no evidentiary basis and the defendant was never given the opportunity to contest it. *Id.* at 472–73, 918 A.2d 506.

The question before us is somewhat different than that which we addressed in the above cases, but the "direct result" statutory language is still significant in that it requires a nexus between the crime, the property damage, and the victim. That nexus is nonexistent in this case. As in *Chaney,* there is no evidence of any expense or out-of-pocket loss incurred by the CICB on Ms. Jackson's behalf. Although evidence of Ms. Jackson's loss was presented to the court, the

nexus between the CICB and that loss was not explained. The court explained at sentencing that the award to the CICB was

> . . . a result of the fact that obviously Ms. Jackson will no longer be able to benefit from these funds; and to indicate the fact that you fostered and have to incur additional expense paid for by the public because she was deprived of the benefit and use of her money by your actions.

There is no indication from the court as to how the "additional expense paid for by the public" relates to the CICB.

The statutory structure also supports our interpretation of the statute. The Criminal Procedure Article, § 11–603(a)(1)–(6), lists the conditions for a judgment of restitution. Each of the six possible conditions envisions a scenario whereby either the victim (CP § 11–603(1)–(2)) or a governmental unit (CP § 11–603(3)–(6)) has incurred some loss of money, loss of property, or a loss in property value. Additionally, CP § 11–603(a)(5) states that a court may enter a judgment of restitution if "the Criminal Injuries Compensation Board paid benefits to a victim." This is the only mention of the CICB in CP § 11–603 and indicates that the General Assembly meant to limit the CICB's ability to receive restitution to those circumstances where it has paid the victim. Similarly, CP § 11–603(a) includes the other entities listed in CP § 11–606(a)(2) as possible restitution recipients, namely the Department of Health and Mental Hygiene and "any other governmental unit," but requires them to have paid the victim's expenses as a condition for a restitution judgment.

The State argues, however, that "had the Legislature intended that an order of restitution payable to the CICB would be premised on a prior award from the CICB, it could have easily provided for such a limitation in the plain language of the statute." Indeed, several of the provisions allowing payment of restitution to other recipients under CP § 11–606(a) contain self-executing limitations. Under CP § 11–606(a)(3), payment to a "third-party payor" requires that such an entity or person must have "compensated the victim for a property

or pecuniary loss ... [or] paid an expense on behalf of a victim."

Should we accept the State's argument, however, we would be forced into countenancing the payment of restitution to the CICB, the Department of Health and Mental Hygiene, or any other governmental unit, so long as one of the conditions listed in CP § 11–603(a) has been satisfied, regardless of whether those entities paid, or were even authorized to pay, any benefits to the victim. In the recent case of *Addison v. State*, 191 Md.App. 159, 180, 990 A.2d 614 (2010), we reiterated that

statutory limitations and due process considerations do not permit an order of restitution for counseling expenses that are not yet certain to occur. We are mindful that the restitution statutes, because they are penal in nature and modify the common law, need to be strictly construed.

(Citation omitted). Thus, we are unwilling to hold that the General Assembly intended for sentencing courts to order restitution to the CICB where it is not a direct reimbursement for payment of a victim's expenses.

■■■ The State argues that should we find that the trial court erred in ordering that restitution be paid to the CICB, we should remand the case to the trial court for a new sentencing. We agree. The statutory scheme allows the trial court to order that the appellant pay restitution to the personal representative of Ms. Jackson's estate. *See* CP § 11–601(j)(2). We see no reason why, upon re-sentencing, appellant could not be ordered to pay restitution to the personal representative of Ms. Jackson's estate. *See, e.g., Chilcoat,* 155 Md.App. at 414, 843 A.2d 240 (trial court has authority to correct its error regarding restitution payee upon re-sentencing). Thus, we vacate that portion [4] of the sentence that

---

4. In *Addison,* the trial court had suspended a ten-year prison sentence because it decided that a more appropriate sentence was to order appellant to pay restitution. *Id.* at 184, 990 A.2d 614. After holding that CP § 11–603 does not authorize a court to order restitution for a victim's pain and suffering, we vacated the entire sentence, which included the ten years' incarceration that had been suspended, 200

ordered appellant, as a condition of probation, to make full restitution of $14,000.00 to the CICB and remand for a reconsideration of the restitution issue.

SENTENCE FOR FRAUDULENT MISAPPROPRIA-TION BY A FIDUCIARY VACATED. PROVISION OF RESTITUTION TO CRIMINAL INJURIES COMPENSA-TION BOARD VACATED. CASE REMANDED TO CIR-CUIT COURT FOR BALTIMORE CITY TO RECONSID-ER THE RESTITUTION ASPECT OF THE SENTENCE. JUDGMENTS AFFIRMED IN ALL OTHER RESPECTS.

COSTS TO BE PAID 75% BY APPELLANT AND 25% BY MAYOR AND CITY COUNCIL OF BALTIMORE.

hours of community service, completion of an anger management program, and court costs. *Id.* at 181, 184, 990 A.2d 614.

This case is different than *Addison* in that the restitution was made a condition of probation rather than essentially replacing incarceration, as was the case in *Addison.* Thus, we will vacate only that portion of the sentence that is illegal, namely the condition that appellant pay $14,000.00 to the CICB.